CASE 101—EQUITY—DECEMBER 16, 1882.

# Hall, &c., v. Marshall, &c.

APPEAL FROM M'CRACKEN CIRCUIT COURT.

By an act of the general assembly, *approved 13th April*, 1880, the sheriff
of Ballard county was required to open a poll at each voting precinct
in the county on the 2d May, 1880, to take the sense of the qualified
voters upon the question of removing the county seat from Bland-
ville to Wickliffe.    The clerk in each precinct was to prepare one
column, in which was to be recorded the names of those in favor of
removal; and in order to ascertain whether a majority are for re-
moval, "the officers comparing the polls shall refer to the assessor's
books, and count thereon each individual assessed for the purpose of

Hall, &c., v. Marshall, &c.

county levy or poll-tax, and from that result determine whether the majority have voted for the removal."

1. The general assembly has the power to change the county seat of a county without any vote whatever, and clearly has the power, in submitting the question of removal to a vote of the people, to. make the assessor's book the test by which to determine whether a majority of the qualified voters have or not voted for removal.

2. There is a marked distinction between elections for public officers, as provided for by article 2, section 8, of the constitution, and elections held under legislative sanction, upon matters affecting local interests alone.

3. The offer of grounds and public buildings as an inducement to the voters of a county to change the county seat is not bribery.

4. Such an offer may often be a matter of economy with the people, and whether in any particular case it has gone so far as to stifle the voice of public sentiment, must be determined by the facts. The offer is not sufficient to invalidate the result.

5. There is a clear distinction between an offer to donate public grounds or buildings to a county as an inducement to the voters to change a county seat and a promise by a candidate for office to donate a sum of money, or other valuable thing, to a third party in case of his election.

J. D. WHITE, W. LINDSAY, AND J. D. WELDS FOR APPELLANTS.

1. That a majority of the qualified voters in Ballard county did not vote in favor of removing the county seat from Blandville to Wickliffe is confessed by the demurrer.

2. In taking the vote, the judges of the election disregarded the provisions of the *act of 13th April*, 1880.

The act of April, 1880, is unconstitutional and void.

4. The proposition of Jenkins and the Nortons to the voters of the county was in the nature of offers to bribe the voters of the county.

5. The change of the county seat will greatly injure the commercial interests of the county. (Acts 1879, vol. 2, 417; McCreary on Elections, sec. 438; 47 Ills., 458; 48 *Ib.*, 263; 20 *Ib.*, 165; Feemster v. Anderson, 6 Mon., 538; 11 Bush, 689; Phillips v. Pope, 11 B. Mon., 173; Slack v. Maysville, 13 *Ib.*, 28, 29; Marshall v. Donovan, 11 Bush, 695; 14 *Ib.*, 221; Cooley on Const. Lim., sec. 616; 11 Mich., 63; 15 Ohio, 532; 17 Iowa, 88; 36 Wis., 213; 10 Iowa, 220; 37 Am. Rep., 417; Brown v. Anderson, 1 Mon., 198; Gen. Stat., chap. 33, art. 12, sec. 11, subsec. 1; 1 Sneed, 694; McCreary on Elections, secs. 134, 89, 448, 455; Constitution Ky., art. 8, sec. 7; *Ib.*, secs. 1 and 2.)

L. D. HUSBANDS AND JOHN & J. W. RODMAN FOR APPELLEES.

1. It was competent for the general assembly to pass an act changing the county seat of Ballard county from Blandville to Wickliffe without any condition whatever.

2. It was therefore clearly within the legislative power and discretion to fix the test prescribed in the act *of 13th April,* 1880. This test is the strongest against appellees that can be conceived. Every voter upon the assessor's books who does not actually vote for removal is to be counted against it. Upon that test the actual majority is 576.

3. The donation offered by Jenkins was not offered for the benefit of any one or class of individuals, nor was it for the benefit of those who might vote for Wickliffe, but for the benefit of the entire county.

4. It has been frequently held that offers of public grounds and buildings, upon condition of removing a county seat, is not bribery.

5. The substance of the act comports with the title. (McCreary on Elections, 148; State v. Purdy, 36 Wisconsin, 213; 20 Pick., 428; Howland v. Brown, 13 Bush, 681; Phillips v. Bridge Co., 2 Met., 222; 2 Met., 168; Chiles v. Drake, *Ib.,* 569; McReynolds v. Smallhouse, 8 Bush, 447; Slack v. M. & L. R. R. Co., 13 B. Mon., 22; Brown v. Anderson, 1 Mon., 198; 10 Iowa, 220.)

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

By an act of the legislature, approved April 1st, 1880, the voters of Ballard county were authorized to vote on the question of removing the county seat of that county from Blandville to Wickliffe. The 1st section of the act directed the vote to be taken on the first Monday in August, 1880, and that the clerk should "prepare two columns in each and every poll-book, for the purpose of ascertaining the desire of the people of said county in relation to the removing the county seat of said county from Blandville to Wickliffe, in said county. The first column shall be headed '*for removal;*' the second, '*against removal;*'" and in taking the vote at said election, the question shall be distinctly put to every qualified voter: 'Are you for or against the removal of the county seat from Blandville to Wickliffe?' and the clerk of the election shall record the vote in accordance with the answer."

The third section provided "that if a majority of all the votes cast be against the removal, then no further steps shall be taken in the matter; but if a majority of all the

legal votes cast at said election, and on said question, be for removal," then the act provides for the removal of the county records, &c., to Wickliffe.

During the same session of the legislature, this enactment was repealed by a subsequent act passed or approved on the 13th of April, 1880, and by the last named act the sheriff was required to open a poll at each of the voting precincts of the county on Saturday, the 2d of May, 1880, to take the sense of the *qualified voters* of the county on the question of removal, and by section two of this last act, for the purpose of taking a vote on the question, it was provided that "the clerk shall prepare *one column* in which to record the votes of those who are in favor of the removal of the county seat to Wickliffe, and the poll-books shall be delivered by the sheriff to the several clerks of the election. The clerk of the election shall propound to each individual voter voting at said election the question: 'Are you for or against the removal of the county seat from Blandville to Wickliffe?' and if said voter answers affirmatively, *then his vote shall be so recorded*, and if he answers negatively, *then no entry shall be made of it on the poll-book.*"

Section four of this act provides that if a majority of the *qualified voters* of the county vote for the removal of the county seat to Wickliffe, then the records, &c., are to be removed, &c., "*and*, in order to ascertain whether a majority of all the qualified voters of the county are in favor of removal, the officers comparing the polls *shall refer to the assessor's books, and count thereon each individual assessed for the purpose of county levy or poll-tax*, and from that result *determine whether the majority have voted for the removal.*" This act was again amended, and the election directed to be held on the 8th of May instead of the second of the month.

The vote was taken under this act on the 8th of May, and those authorized to compare the polls reported that 1,763 voters of the county had cast their votes in favor of removing the county seat from Blandville to Wickliffe, and that the assessor's book for the year 1880 showed 2,950 polls assessed for the purpose of county levy or poll-tax. The comparing board divided the 2,950 polls, the one half of the number being 1,475, and this last number they subtracted from the number of votes for removal, showing by their report a majority of 288 votes in favor of removal, but in fact the majority was 576 votes. Take from the 2,950 votes, which is the entire vote of the county, the 1,763 votes cast *for removal*, and it leaves *against* removal 1,187 votes, and this number from 1,763, leaves a difference of 576.

The poll-books were returned, and the board for examining and comparing the vote regularly organized, and the result reported. Hall and others, who are opposed to the removal, filed this petition in equity against the county judge and others, enjoining them from removing the records from Blandville to Wickliffe until the matters alleged in their petition could be heard and determined. Various grounds are relied on for the injunction, and among the number is certain irregularities in the conduct of the election, and the manner in which the poll-books were returned, the failure of the officers to take the oath required by law, &c., all of which, if established, does not affect the question as to the right of removal, and besides, the proof shows that no such irregularities existed as could affect the validity of the election even if this court had the right to determine such questions.

It is also insisted that at least 320 of the votes cast for removal were not qualified and legal voters of the county,

and a list of the names is furnished with the petition; but upon this point there is a failure of proof, if it be conceded that the chancellor had the power to purge the polls of illegal votes. The principal ground of complaint is, that many of the voters were disfranchised by the mode in which the vote was required to be taken, and that the provision of the act in this regard is in violation of the spirit, if not the letter, of the constitution. An amended petition was offered to be filed, in which it is alleged that there is exceeding thirty-six hundred voters in the county, and that these voters were residents and qualified to vote at the time the election took place; that the assessor's books failed to show the number or names of those entitled to vote, or who were subject to the payment of county levy and poll-tax to the number of 585, and therefore Wickliffe failed to obtain a majority of the qualified voters of the county. To that amendment a demurrer was sustained, and this leads us to the consideration of the constitutional question raised, and the power of the legislature to make the assessor's books the test for determining the result of the election between Blandville and Wickliffe. If this question is to be determined by the provisions of section 8, article 2, of the constitution, and to be regarded in the light of an election for public officers, then every citizen qualified to vote had the right to have his name entered on the poll-book and his vote recorded; but, as suggested by the chancellor below, there is a marked distinction between elections for public officers and elections held under legislative sanction upon matters affecting local interests, such as votes for and against local option, the removal and location of county seats, and even upon the question of local taxation.

This court, in the case of Marshall v. Donovan, 10 Bush, in reference to taxation for school purposes, determined that aliens, widows, and all interested, might vote, to the exclu-sion of the colored race, because the latter had no interest in the result.   The court held it not to be an election in the sense of the constitution, but the action of an agency selected by the legislature to determine when the conditional law should become operative.   (See also Borce v. Smith, 47 Illinois.)

It must be conceded that the legislature had the power, regardless of the agency employed, to remove the county seat from Blandville to Wickliffe, or to have authorized the county court, composed of the justices or a majority of them, to determine the question; still it is insisted that the qualified voters of the county were entitled to vote, and that those not on the assessor's book have been denied that right, unless voting for the removal.

The question then is: Has the legislature the power, in selecting as its agency the *qualified voters of the county*, the additional power of prescribing the test by which these qualified voters are to be ascertained?   By the first act, passed at the same session of the legislature, the clerk was directed to make out two columns in each poll-book, head-ing one *for removal*, and the other *against removal*, and in taking the vote, the clerk of the election was directed to record the vote as it was polled, *either for or against removal*, and a majority of the votes cast at the election determined the question of removal.   The members evidently saw that this might result in favor of a removal against the views or wishes of a majority of those actually entitled to vote, and hence the necessity of changing the law.   They might have added that, although the vote for removal might exceed the

Hall, &c., v. Marshall, &c.

vote against it, still that no removal could be had unless the vote for removal constituted a majority of all the quali-fied voters in the county; and in order to determine this, the assessor's book should be resorted to, as in the present case. The constitutionality of such an act cannot be doubted. This law, however, was repealed, and the act we are now construing was passed, by which the clerk was required to prepare only *one column* in which to record the votes in favor of removal to Wickliffe, and the clerk of the election shall propound to each individual voter the question: "Are you for or against the removal of the county seat from Blandville to Wickliffe?" and if said voter answers *affirma-tively, then his vote shall be so recorded*, and if he answers *negatively, then no entry shall be made of it on the poll-book.* In the fourth section it is provided, *in order to ascertain whether a majority of all the qualified voters of the county are in favor of removal, the officers comparing the polls shall refer to the assessor's books, and count thereon each individual assessed for the purpose of county levy or poll-tax, and from that result determine whether the majority have voted for the removal.*

There must necessarily be some test, in such a case, in order to determine whether a majority of the qualified voters have been heard to speak, and in prescribing this test some will necessarily vote, who are not on the assess-or's book, in favor of the measure, and others, who are on the assessor's book, and who are counted against the re-moval, may not be entitled to a vote. No test can be prac-tically made so as that every voter can be heard. Now, in order to ascertain the will of a majority of the qualified voters, the law-making power has said that every man on the assessor's books, who is subject to county levy or poll-

tax, shall be counted *against removal*, and before you can change the county seat, you who favor the removal must obtain a majority of all those who have been assessed in the manner provided by the act. A bare majority of all the votes cast will not be sufficient, and the law-making power has assumed that these names in the assessor's books constitute all the qualified voters of the county, and this entire vote is by the act itself cast against removal. The right to prescribe such a test, we think, is beyond controversy, and that the qualified voters have been heard in opposition to removal by such legislative action. The legislature must provide the mode of ascertaining the sense of the people, and if constitutional, although it may give one or the other of the parties the advantage, this court is powerless to disregard the legislative will.

It is argued that the desire to vote, and have the name recorded, influenced many to favor. removal; while many, who were opposed to the movement, were persuaded to vote for it, because their vote could not be recorded against it on their first appearance at the polls. This may be true, and doubtless is; but, at the same time, it is much more difficult to carry an affirmative proposition of this sort, with the whole vote on the assessor's books against the proposition, than to obtain a bare majority of the votes cast. Section 1 of article 12 of the constitution provides the manner of revising the constitution, and requires a majority of all the votes entitled to vote for representative, at two successive elections, before delegates can be elected. For the purpose of ascertaining whether a majority of the citizens have thus voted, the legislature is given the power to prescribe the test. All the votes, as reported to the auditor, are counted against the convention, and a majority must be obtained

before a convention is called. The difficulty in obtaining such a vote is a matter of history.

The legislature has fixed a test somewhat similar in this case, and we perceive no objection to it. The assessor's books showed 2,950 polls in the county, and the proof shows that this number exceeds by near four hundred the vote at any preceding election in the county, and whether you make the *census* or the assessor's book the test, the result is about the same. There is no fraud in the procurement of the act and none alleged, and we think it manifest that the legislature intended to have recorded the names and votes of those only who favored removal, having first cast the entire vote of the county, in effect, against removal. The act being constitutional, the chancellor had no power to determine, in any other manner than that pointed out by the act, as to the number of qualified voters in the county. The remaining question arises as to the improper influences alleged to have been exercised over the voters by the friends of Wickliffe in order to obtain their votes for removal.

It seems that the court-house at Blandville had been destroyed by fire, and the only public building connected with the court-house square was the county jail. This building, as is alleged in the pleadings, was of the value of four or five thousand dollars. What its real value was does not appear from the proof.

Shortly before the vote was taken, Norton, a resident of Louisville, and S. Jenkins and others, residents of Ballard county, owning land in the vicinity of Wickliffe, published and had circulated a circular, in which they agreed to build a court-house at their own expense, and convey the grounds, and with it the building, to the county. This circular was

headed, "Save taxation;" "Vote for removal to Wickliffe;" "Buildings and grounds given free of cost to the county." The performance of this undertaking on the part of these parties was also guaranteed by other citizens of the county. It is also alleged that liquor was freely used by the Wickliffe party on the day of the election, and that the vote was obtained by bribery and improper influences. It is not shown that any bribe was offered or accepted. Some of the friends of removal jocularly proposed to men of the opposition, who were above suspicion, to come down to Wickliffe and they would give them a lot or lots, but no lot was given or accepted.

It further appears that the court-house has been built by these parties, and a deed tendered to the county court to the public square during the pendency of this litigation, and they refused to accept it until the litigation ended. So the county has a jail at Blandville and a court-house at Wickliffe.

There can be no doubt but that the propositions made by S. H. Jenkins and others influenced some of the voters to favor the removal. More than one hundred depositions have been taken on each side of this case; the proof of the Blandville party showing that many were influenced to vote for Wickliffe by reason of the circular, and going so far as to give the names of the voters whose minds had been affected by it; while the depositions on the other side, in many instances, of those whom it was said had been induced to vote for Wickliffe by the promise of the Wickliffe party, in which they state that the inducement to vote for the latter place was its location on the railroad and river, and they believed it would be the means of building up a commercial town in their midst. The proof is as conflict-

ing as it could well be made on all the issues of fact, and as is natural in an excited controversy like this. It is evident, however, we think, that the publication of this circular had the effect to change the minds of some of the voters. It could not well be otherwise; and the offer to furnish the court-house and grounds was intended as a set-off to the loss the county would sustain, as was argued on the other side, by losing its jail, and with a view also of obtaining votes for Wickliffe.

McCreary on Elections, section 148, page 109, states the rule to be "the giving or offering to give facilities for the public convenience of the whole county as an inducement to remove a county seat, or the offering of a public advantage to an entire community as an inducement for the members of such community to vote for such removal, does not constitute bribery, and will not avoid an election held to decide the question of such removal."

In Deshon v. Smith, 10th Iowa, a case involving the question of removing the county seat, the citizens of the one town agreed to pay five hundred dollars to build a bridge, connecting the two townships, and to convey certain real estate to the county, in order to relieve some of the objections to the removal. The county judge in that case was enjoined, as in the present case, from removing the records, &c., in accordance with the vote, and in the petition or complaint, it is alleged that the agreement was made with a corrupt intent, and of procuring votes, so as to change the result. The court said: "We do not think the giving facilities for the public convenience to the whole county, such as furnishing a building for the courts and offices, and thus relieving a county from a burden of expense, amounts to bribery. If the people of a town desire

a county seat located at such place, there is no wrong and no corruption in their offering and giving facilities to produce such a result."

In the case of Overman & Brown v. Kerr, reported in 17 Iowa, an act was passed, authorizing certain commissioners to locate and establish the seat of justice of Black Hawk county. The act required them *to locate the county seat with reference to the best interests of the county.* A controversy originated as to the right of the commissioners to bind the county by contracts with the owners of the property. The court, in discussing that question, said: "It is not necessary to deny that the commissioners might, under the act, if they deemed it best for the county, make the location with reference to the proposed donation, but the act did not empower them to bind the county to the performance of any obligation whatever."

In the case of Newell v. Purdy, supreme court of Wisconsin, it was held that a vote given for a candidate for any public office, in consideration of his promise, in case of his election, to donate a sum of money or other valuable thing to a third party, whether such a party be an individual or a county, will be rejected by the court when called upon to declare judicially the result of the election. In that case, the court drew the distinction between the election of public officers "to whom, for the time, being, the exercise of the functions of sovereignty is intrusted, and the mere choice of a site for a public building. The former involves, or may involve, the integrity of the government, and the preservation of the principles upon which it is founded, while the latter is only a matter of public convenience or pecuniary interest, involving no fundamental principle whatever."

It is argued that the distinction recognized by the court in that case was not necessary to the determination of the question involved, and the familiar rule that cases are only authorities to the extent of point in judgment should apply. While this may be so, there is a manifest difference as to the effect of such influences in the sale and purchase of a public office, and that of an offer by the citizen to donate his grounds for a county seat. The choice, where the office is bought and sold, or made because of a price paid, is from a consideration that ought not to influence the voter, and besides, would result in the selection of those incompetent to perform the duties of the office. The offer of ground for public buildings, or the public buildings then erected, may often be a matter of economy with the people; and whether in the particular case it has gone so far as to stifle the voice of public sentiment, and to work an oppression on the people, must be determined by the facts. The offer itself is not sufficient to invalidate the result.

The case of Brown v. Anderson, reported in 1st Monroe, and referred to by appellant's counsel, involved the right to enforce the performance of a contract evidencing the sale of a lot or part of a lot in Frankfort. One Gullion had conveyed, or agreed to convey, to the state, and the appellee, the vendor, had derived his claim through the state. It was insisted that the contract between the state and Gullion was against sound policy and void, as the ground in controversy was donated to the commissioners for the state selected to locate the capitol, as an inducement for them to make the location at Frankfort.

The first constitution of the state provided that the legislature should elect five commissioners, with power to locate the capitol, and these commissioners *were empowered to*

*receive grants from individuals therefor*, and to make such conditions as they saw proper. The policy of making such agreements, or rather, of receiving donations, was authorized and sanctioned by the convention that framed the constitution, and the contracts afterwards ratified by the legislature; and for this reason this court adjudged that it precluded further inquiry. The policy of making such contracts was questioned by the court in that case, and the commissioners certainly had no power to enter into any such agreement without the authority of the principal. Nor do we mean to say that the legislature has the power, or that it would be sound policy, to put up the county seats of the several counties at auction to be knocked off to the highest bidder.

All the cases to which our attention has been called by counsel for the appellant relate directly to corrupt influences used to obtain a public office. The merit or qualifications of a candidate is lost sight of by the voter in all such cases, and regarding it in either a legal or political sense, it is subversive of the purity of the elective franchise, as well as sound public policy.

Proceeding, then, to the consideration of the facts in this case, after a careful consideration of the record, we have but little doubt that the choice made of Wickliffe as the county seat was by a majority of the qualified voters of the county, and certainly so if determined by the legislative test.

The legislature, instead of permitting a bare majority of the votes cast to determine the question, has required that the assessor's books should be the test, and the voice of the voters obtained in that mode. This was favorable to the appellants and against the appellees. At the same session of the legislature the assessor of the county was given until

the 17th of May, 1880, to complete his work. By this book the test was to be made. Both the assessor and his deputy were the friends of Blandville, and opposed to removal. The names upon the assessor's books subject to county levy and poll-tax numbered near five hundred more votes than had ever been polled at any preceding election. The party in favor of removal obtained nearer two thirds than one half of the entire vote, and not only so, immediately following this vote, an election was held in the county for county judge. Blandville had its candidate, and Jenkins, who had issued the circular, and who is charged with using improper influences in favor of Wickliffe, was the candidate of the Wickliffe party. They were both men of ability, position, and influence. They canvassed the county upon the issue as to the county seat, and Jenkins was elected by a majority of eight hundred votes.

It is said that two of the county candidates in favor of Blandville (sheriff and clerk) were also elected; but it clearly appears that they declined to make the question a test, while the entire proof shows that the issue was fairly made between Jenkins and the Blandville candidate.

In the midst of a canvass fraught with so much interest, it is hardly to be supposed that personal considerations could have influenced those in favor of Blandville to vote for Jenkins.

If the learned chancellor below was even in error in sustaining a demurrer to the amended petition, the allegations of which had the effect to nullify the legislative test, still, upon the merits of this controversy, he should have dissolved the injunction. Concurring, however, with the chancellor in his ruling below, we must affirm the judgment. The same is therefore affirmed.