TOWN OF GROVE v. HASKELL, *Governor, et al.*

No. 583.    Opinion Filed September 14, 1909.

(104 Pac. 56.)

1. COUNTIES—County Seat Election—Petition—Sufficiency. The petition on which the county seat election, provided for in section 6, art. 17 (Snyder's Const. Okla., p. 340), of the Constitution, is called need not contain the name of any town to which removal or change is sought. The statutory form (section 3, art. 4, c. 31, p. 379, Laws 1907-1908) substantially meets the requirement of the Constitution.

2. COUNTIES—County Seat Election—Notice—Harmless Irregularity. The public notice of a special election cal.ed to vote upon the change, removal, or relocation of a county seat, provided for in section 6, art. 17, of the Constitution (Snyder's Const. Okla., p. 340), should be given as prescribed in the proclamation of the Governor; but where, in a controversy arising out of an election held, it is shown that the provisions in reference to notice were substantially complied with, and there is no averment or showing that the electors did not have actual notice or knowledge of the election, and fai.ed to participate therein by reason thereof, the same will not be held void or set aside. The vital and essential question in such cases is, Did the want of notice or knowledge result in depriving a sufficient number of the electors of the opportunity to exercise their franchise as to change the result of the election? if not, then the will of the electors, as expressed, should be sustained.

3. ELECTIONS—Harmless Irregularity in Form of Ballots... The provisions of section 2, art. 3, c. 31, p. 329, Laws 1907-1908, prescribing the duties of the county election board in the preparation of ballots, are mandatory as to such board, and should be observed by a special election board, charged with the same duties; but, where such special election board ignores some of these provisions, and prepares ba lots different in form and detail from those prescribed, but distributes the same uniformly throughout the county, and they are received by the electors, and by them in good faith cast, they will not, in the absence of fraud, be disregarded and an election held therewith annulled.

4. ELECTIONS—Statutes—Duty to Uphold—Irregularities—Presumptions. Elections are the ultimate expression of the sovereign will. When fairly expressed—that is, free from taint of fraud or charge of improper conduct—it becomes the duty of courts to sustain them, where it can be done by a liberal construction of the laws relating thereto, rather than defeat them by requiring a rigid conformity to technical statutory direc-

tions, which do not affect the substantial rights of the electors. All reasonable presumptions as to their regularity will be indulged, and the penalty of disfranchisement will not be visited upon a qualified voter where he is not at fault, except in response to a plain mandatory requirement of the statute.

5.    **COUNTIES—County Seat Election—"Place."** A tract of land or locality which, prior to the date of a proclamation issued by the Governor calling a county seat election, had been by its owners surveyed and platted, and which was, after the issuance of the proclamation, and before the election, the scene of a public picnic, attended by a large number of the voters of the county, and at which a public auction of the lots of the place was held, and public notice given of its metes and bounds, and the location of which was well known to the voters of the county, is a "place," as the word is used in Const. art. 17, sec. 6 (Snyder's Const. Okla., p. 340).

6.    **COUNTIES—County Seat Election—Bribery.** Under the provisions of section 7, art. 17 (Snyder's Const. Okla., p. 341), the giving or offering of lots, land, or other things of value, either directly or indirectly, for the purpose of influencing voters for or against any competing town or place in a county seat election, is bribery, and votes secured as a result thereof are illegal and void, and should not be counted.

(Syllabus by the Court.)

*Original proceeding for an injunction by the Town of Grove against C. N. Haskell, Governor, and others.*

*Ad. V. Coppedge, J. G. Austen,* and *W. H. Kornegay,* for plaintiff, citing: 15 Cyc. 320 to 326; McCrary on Elections, sec. 185; Abbott on Municipal Corporations, secs. 73, 75; Throop on Public Officers, sec. 150; *George v. Oxford,* 16 Kan. 72; *People v. Com'rs,* 3 Neb. 244; Cooley on Const. Lim., sec. 603; *Jones v. State,* 1 Kan. 259; *State v. Com'rs,* 75 Mo. 614; *Marion v. Territory,* 1 Okla. 210; *McClelland v. Erwin,* 16 Okla. 612; *State ex rel. v. Taylor* (N. C.) 12 L. R. A. 202; Black on Interpretation of Laws, sec. 13; *Fall River Co. v. Powell,* 5 S. D. 49.

*Owen & Stone* and *Bailey & Kistler,* for defendants, citing: *Desha v. Smith,* 10 Iowa, 217; *State v. Skirving,* 27 N. W. 723; *People v. Crissey,* 91 N. Y. Ct. App. 635; *Foster v. Scarff,* 15 Ohio St. 537; *Demaree v. Johnson,* 50 N. E. 376; *Wheat v. Smith,* 50 Ark. 266; *Adsit v. Secretary of State,* 11 L. R. A. 537; *State ex rel. v. Millar,* 21 Okla. 448.

DUNN, J.  This is a proceeding brought by the town of Grove, praying an injunction restraining the Governor from issuing a proclamation carrying out the expressed will of the voters of Delaware county, as shown by the returns in a county seat election brought and held for the purpose of changing, removing, or relocating the county seat of that county.  A place called Jay was, on the face of the returns, the successful competitor in the election.  The petitions filed with the Governor, upon which it was called, conformed to the requirements of an act of the legislative assembly of 1907-1908, found at page 378, c. 31, of the laws of that session, and petitioned the Governor to call an election to relocate the county seat of Delaware county under the provisions of section 6, art. 17 (page 340, Snyder's Const. Okla.) of the Constitution.  It is contended, on the part of counsel for plaintiff, that these petitions should have named some place to which the electors desired to have the county seat changed or removed.  The section of the Constitution relating to the removal of county seats, after stating that the towns named should be and remain the county seats for their respective counties until changed by a vote of the qualified electors thereof, provides that "upon a petition or petitions in writing, signed by twenty-five *per centum* of the qualified electors of the county," the same "having been filed with the Governor at any time after four months after the admission of the state into the Union, the Governor shall within thirty days issue his proclamation calling an election to be held in such county not less than sixty nor more than seventy days from the date of his proclamation."  The same section of the Constitution then provides that competing towns, aspirants for the county seat, may "more than twenty days prior to such election, file with the Governor verified petitions therefor as above mentioned, signed by not less than three hundred qualified electors of said county."  It is not claimed by counsel that there is any specific provision in the Constitution sustaining their contention but it is urged that it was not within the contemplation of the

framers of the Constitution that an election should be called except on petitions showing a desire for a removal to some specific place. To our minds the Constitution is not susceptible to the construction urged. Two petitions are provided for; one by the qualified electors of the county filed for the purpose of calling an election. There may not be any other town than the county seat town competing or desiring at that time to compete. The provision was so framed that a county seat agreeable to all the county could call an election, and settle the question so as to qualify the officials to expend public money for courthouse and jail construction prior to April 1, 1909, as provided for in the latter part of paragraph "b," § 6, art. 17. After the first petition is filed, then it is provided that those towns desiring to enter could do so on filing, 20 days prior to the election, a verified petition signed by 300 qualified electors of the county. The scheme as written is a simple and practical one, and to our minds there is no reasonable ground on which to predicate the construction for which contention is made.

The petition filed in this court presents four different causes of action. The defendants have answered them in four counts, to each of which counsel for plaintiff have filed a demurrer challenging their sufficiency to constitute a defense. The case is an original proceeding, brought under the provisions of section 16, art. 4, of the chapter on Elections (Laws 1907-1908, p. 385, c. 31), and in order to facilitate the hearing and make definite the issues, we have carried the demurrer in each instance to the allegations of the petition to ascertain whether a cause of action was stated.

The first proposition under the pleadings to which our attention is directed is that of the notice given under the proclamation. The Constitution provides (section 6, art. 17, *supra*) that upon the filing of the petition, "such election shall be held under the provisions of the election laws of the state, and

upon such public notice of such election as the Governor in his proclamation may direct." The proclamation provides that:

"Notice of such election to be given by publication of this proclamation for six consecutive weeks preceding said election in the Grove Sun, published at Grove, Oklahoma, and by posting in a public place in the towns or places of Kansas, Needmore, Bucha, Zena, Cleora and Rose, for a period of at least six consecutive weeks next preceding the date of such election as herein ordered."

Election was called for the 8th day of December, 1908, the proclamation was published in the paper in accordance with the requirements. The notices to be posted, however, were posted within the week following October 27, 1908, which was the last day on which they could be posted and meet the full requirements of the proclamation. So that they were posted between five and six weeks, instead of the full term of six weeks. The election which was called was a special election; no statute fixed the time at which it was to take place. The time under the Constitution was to be fixed by the Governor in his proclamation, and it is insisted by counsel for plaintiff that, unless the notices were posted in strict conformity with the terms of the proclamation, and this without reference to whether or not the electors had actual notice or knowledge, and actually participated in the election, the same must be held to be illegal and void. In other words, it is their claim that in cases of this character a valid election cannot be held except upon strict compliance in posting and publishing of the notices, and that the notice itself, posted and given in strict conformity with the proclamation, is an essential prerequisite to a valid election. On the other hand, counsel for defendant insist that a special election will not be declared void, notwithstanding any formality or failure on the part of the officers charged with the duty of posting the notices, where the same are in fact posted in substantial compliance with the terms of the proclamation, and it is not also shown that the electors of the county did not in fact have actual knowledge of the election. Counsel for plaintiffs in their

petition in no manner aver or charge that any voter failed to attend and vote at the election held, by reason of want of notice or knowledge, or that the failure to post the notices in exact conformity with the requirements of the proclamation had any effect whatsoever upon the result of the election. In the absence of such showing and averment it is our judgment the correct rule in such cases is that, although the notices may be posted for a time less than that specified, the court will not, for this reason alone, declare the election void, at the suit of a party who participated therein where it is not also shown that the electors of the county did not participate therein by reason of lack of notice or knowledge, and that a different result would have obtained if the full statutory notice had been given. *Ellis et al. v. Karl et al.,* 7 Neb. 381; *State ex rel. Berge v. Lansing et al.,* 46 Neb. 514, 64 N. W. 1104, 35 L. R. A. 124; *State ex rel. Malloy v. Skirving,* 19 Neb. 497, 27 N. W. 723; *Dishon v. Smith,* 10 Iowa, 212; *State ex rel. Mullen v. Doherty,* 16 Wash. 382, 47 Pac. 958, 58 Am. St. Rep. 39; *Williams v. Shoudy,* 12 Wash. 362, 41 Pac. 169; *Seymour v. City of Tacoma et al.,* 6 Wash. 427, 33 Pac. 1059; *State ex rel. Crocker v. Echols et al.,* 41 Kan. 1, 20 Pac. 523; *Demaree et al. v. Johnson et al.,* 150 Ind. 419, 49 N. E. 1062, 50 N. E. 376; *City of Lafayette et al. v. State ex rel. Jenks et al.,* 69 Ind. 218; *Fike v. State of Ohio,* 4 Ohio Cir. Ct. R. (N. S.) 81; *Herpster v. Brower et al.,* 5 Ohio Cir. Ct. R. 395; *Foster v. Scarff,* 15 Ohio St. 532; *State ex rel. Attorney General v. Taylor,* 15 Ohio St. 137; *Wheat v. Smith,* 50 Ark. 266, 7 S. W. 161; *Commonwealth v. Smith,* 132 Mass. 289; *People ex rel. Wood v. Crissey,* 91 N. Y. 616; *Adsit v. Osmun, Secretary of State,* 84 Mich. 420, 48 N. W. 31, 11 L. R. A. 534; *State v. Carroll,* 17 R. I. 591, 24 Atl. 835; McCrary on Elections, §§ 177-179; Mechem on Public Officers (Ed. 1890) p. 109, § 176; 10 American & English Encyclopedia of Law, p. 626; 15 Cyc. pp. 324, 325; *State ex rel. Chase v. McKinney,* 25 Wis. 416.

In the consideration of this question the court has endeav-

ored to examine every case and every authority touching it; and while it may be said that there are authorities not in full harmony with the rule as declared in the foregoing (aside from the local option cases which appear generally to be in a class by themselves); we have found no case where it did not appear that there were strong reasons within the case itself persuading the court to the holding made. As we have observed in cases where the question submitted involved the voting in or out of intoxicating liquors, the courts have generally held that a strict compliance with the notice was a necessary prerequisite to a valid election. Such cases may be noted as follows: *Haddox v. County of Clarke,* 79 Va. 677; *State ex rel. Weber v. Tucker et al.,* 32 Mo. App. 620; *State ex rel., etc., v. Martin,* 83 Mo. App. 55. Even were so important a question as the imposing of bonds on a community to be decided at a special election, the rule which we have declared is recognized. *McPike et al. v. Pen, Sheriff, et al.,* 51 Mo. 63; *Morgan v. Gloucester City,* 44 N. J. Law, 137. In each of the cases cited the election was held void for want of sufficient notice. The fact that the electors did not have actual knowledge of the election was the foundation upon which the court based its decision.

In the case of *Morgan v. Gloucester City, supra,* the Supreme Court of New Jersey, dealing with this question, said:

"The election was of vast importance to the inhabitants, involving, as it did, the incurring of a large debt by a small community. Under such circumstances, would there not have been a full vote if notice had been properly given? The population of Gloucester City in 1880 was a little over 5,000. At the general election of that year nearly 1,000 votes were cast. At the special election of December 21st, only 508 votes were polled, of which 232 were against the adoption of the provisions of the act of 1876. Soon after the election more than 600 voters within the city protested in writing against the scheme. The notice of the special election was illegal, and therefore the election itself is invalid. On account of the irregularity and insufficiency of the notice the election of December 21, 1880, operated upon many as a surprise."

There are some few cases holding that failure to give notice

of a special town meeting in the specific manner required will render the meeting void. *Hubbard v. Town of Williamstown,* 61 Wis. 397, 21 N. W. 295; *Pratt et al. v. Town of Swanton,* 15 Vt. 147. Cases of that character, however, can scarcely be held to be in point, as the facts are not at all similar to cases where there is held an election by the whole people of a community, instead of a meeting of the town board. Neither, in our judgment, are cases of the character of *George v. Township of Oxford,* 16 Kan. 72, in point, for the reason that the election in that case was held prior to the time when, by the specific terms of the statute, it was legally possible to hold an election. The act of the Legislature providing for the election was approved March 21, 1872. It provided 30 days' notice should be given of the election. The election took place on April 8, 1872, or on 15 days' notice, and the court held the same to be void, by reason of the fact that sufficient time had not elapsed after the act took effect within which to give notice prescribed by the statute. Nor do we regard the rule laid down in the case of *Gossard et al. v. Vaught et al.,* 10 Kan. 162, applicable to the case at bar, by reason of the dissimilarity of the question there before the court and the one involved in this case. The plaintiff is assailing the validity of the election, and the burden it must sustain, if it succeeds, is to show that the irregularity pleaded resulted in substantial prejudice. It is not enough to show merely that the irregularity existed.

The Supreme Court of the state of Iowa, in the case of *Dishon v. Smith, supra,* on a question identical with the one at bar, said:

"The records do not show that notices of the election were posted in the townships, and the averment that such notice was not, in fact, posted in the township of Marietta. And it has been remarked, further, that the people are not to be disfranchised, to be deprived of their voice, by the omission of some duty by an officer, if an election has in fact been held at the proper time, and that such a penalty ought not to be visited upon them for the negligence or wilfulness of one charged with similar duties. Upon considerations like these the courts have held that the voice

of the people is not to be rejected for a defect, or even a want of notice, if they have in truth been called upon and have spoken. In the present case, whether there were notices or not, there was an election, and the people of the county voted, and it is not alleged that any portion of them failed in knowledge of the pendency of the question, or to exercise their franchise."

The Supreme Court of the state of Nebraska, in the case of *Ellis et al. v. Karl et al., supra,* which was likewise a county seat contest, on this question said:

"In ordering an election on the question of the relocation of a county seat, 30 days' notice is required. But even if the notice be for a less time than this, a court of equity will not, for this reason alone, declare the election void at the suit of a party who participated therein, especially where it is not shown that a different result would probably have been obtained if the full statutory notice had been given."

The law in that case required 30 days' notice to be given of the election, by written or printed notices posted up in each election precinct. It appears that the notices were not given for full time, and in the discussion of this question the court said:

"But, notwithstanding the failure to give the full statutory notice, we do not think that the plaintiffs are in a situation to complain for the want of it. The only purpose which the notice could serve was that the question to be voted upon might be brought to the attention of each elector, and an opportunity afforded him to attend the election and express his opinion concerning it through the ballot box. Such being the purpose of the notice, it seems but just to require a party who bases his claim to equitable relief on the failure to give it to show that for the want of it he has sustained the injury which he seeks to have redressed."

The Supreme Court of the state of Kansas, in the case of *State ex rel. Crocker v. Echols et al., supra,* recognized the necessity for the existence of both elements, to wit, lack of full notice, followed by a failure of the electors to participate.

"The giving of notice substantially in the manner directed by law is a prerequisite of the validity of such an election; and, where there is a failure to post notices at any of the polling places, and a large number of the electors of the county fail to vote upon the proposition, the election will be void."

The Supreme Court of Washington, in *State ex rel. Mullen v. Doherty, supra,* in the consideration thereof said:

"The vital and essential question in all cases is whether the want of the statutory notice has resulted in depriving sufficient of the electors of the opportunity to exercise their franchise to change the result of the election."

The Supreme Court of Arkansas, in the case of *Wheat v. Smith, supra,* likewise sanctioned the same rule, holding:

"The question in such cases is whether the want of the statutory notice has resulted in depriving sufficient of the electors of the opportunity to exercise their franchise to change the result of the election."

The Supreme Court of Indiana, in the case of *Demaree et al. v. Johnson et al., supra,* speaking to the same subject, said:

"If it were shown that the failure to give the notice in the manner provided for in the statute had resulted in preventing such a number of electors from participating in the election as would have changed the result if they had voted, then the failure to give the notice as required by the statute would be fatal."

Finally, the rule approved by Mr. McCrary in his work on Elections, at section 177, is as is stated by Mr. Chief Justice Brinkerhoff of the Supreme Court of Ohio in the case of *Foster v. Scarff, supra,* and is as follows:

"We do not intend to hold, nor are we of the opinion, that the notice by proclamation, as prescribed by law, is *per se,* and in all supposable cases, necessary to the validity of an election. If such were the law, it would be in the power of a ministerial officer by his misfeasance always to prevent a legal election. We have no doubt that, where an election is held in other respects as prescribed by law, and notice in fact of the election is brought home to the great body of the electors, though derived through means other than the proclamation which the law prescribes, such election would be valid. But where, as in this case, there was no notice, either by official proclamation or in fact, and it is obvious that the great body of the electors were misled for want of the official proclamation, its absence becomes such an irregularity as to prevent an actual choice by the electors, prevents an actual election, in the primary sense of that word, and renders invalid any semblance of an election, which may have been attempted by a

few, and which must operate, if it be allowed to operate at all, as a surprise and fraud upon the rights of the many."

All reasonable presumptions are in favor of the regularity of an election, and it should not be held void unless clearly illegal. *State ex rel. Love et al. v. Freeholders of Hudson County,* 35. N. J. Law, 269. Elections are not held in order to give opportunities to post notices and to conform to other technical details and requirements of law, but notices and other legal requirements are provided in order that elections may be lawfully and fairly held, and that people entitled to participate therein may have notice thereof. The end to be accomplished in every case, not the means, is the chief purpose of the law. The thought we have in mind is well expressed in the case of *Taylor v. Taylor et al.,* 10 Minn. 107 (Gil. 81), as follows:

"The public good demands that the will of the people as expressed at the ballot box should not be lightly disturbed. There is hardly an election held in any county at which in some town irregularities do not occur, and to declare every such election void would work a manifest hardship and injustice. If the votes of the citizens are freely and fairly deposited at the time and place designated by law, the intent and design of the election are accomplished. It is the will of the electors thus expressed that gives the right to the office, or determines the question submitted, and the failure of the officers to perform a mere ministerial duty in relation to the election cannot invalidate it, if the electors had actual notice, and there was no mistake or surprise"—
citing authorities. And also in the case of *Ex parte White,* 33 Tex. Cr. R. 594, 604, 28 S. W. 542, 544:

"Elections are the ultimate expression of the sovereign will. When fairly expressed—that is, free from taint of fraud or charge of improper conduct—it becomes the duty of courts to sustain them, where it can be done by a liberal construction of the laws relating to elections, rather than defeat them by requiring a rigid conformity to law. The great public purposes which are accomplished by elections demand this."

The observations contained in the Texas and Minnesota cases may be invoked with equal applicability to the second proposition raised by counsel, which relates to the regularity of the bal-

lots furnished. It is conceded that certain legal requirements were not complied with by those charged with the duty of preparing and furnishing the ballots. Section 6, art. 4, of the chapter on Elections (Laws 1907-1908, p. 380), provides as follows:

"When an election is called for the purpose of selecting a permanent location for a county seat, the governor of the state shall appoint some person, resident of the county, who does not live or reside in either city or town which is a candidate for county seat honors, or which is to be a candidate for said honors, and each of said rival towns is to select one person each who shall constitute said election board, with duties as provided by law for county election boards, when not in conflict herewith. Said appointment of said members of said special election board shall be made upon the recommendation of the mayor or of the president of the town board of trustees, or in event said place has neither, then upon the recommendation of the president of the organization representing said place, so being a candidate for the location of said county seat of said county. It shall be the duty of such special election board to prepare and cause to be prepared, and to distribute ballots for said election as provided by law for general elections; said ballots to contain the names of each and every city, town or place as certified to said board by the Governor of the state."

The duties of the county election boards as prescribed by the general election laws, in section 2, art. 3, c. 31, p. 329, of the same volume, are as follows:

"The county election boards shall let the contract for printing the ballots within their jurisdiction and furnish the necessary election supplies herein required, to the lowest and best bidder. The board will furnish specifications to bidders, and specifications shall be alike to all bidders. The county election board shall require a bond from the successful bidder in a sum double the amount at which said contract is let. Said bond shall be taken in the name of the county, and conditioned upon the faithful performance of said contract. The State Election Board shall furnish each county board with a sufficient supply of blank affidavits for the use of the printers who have charge of the county work, such blanks to be the same as those used for the state printing, and said affidavits shall be filed in the office of the county board."

This section is followed by section 3, which provides for an affidavit to be made by the printer, showing that proper security

and circumspection were observed in preparing and printing the ballots. Section 7, art. 4, p. 336, provides that the ballots shall be printed with a stub perforated, in order that the ballot may be easily detached therefrom. Also, in the upper righthand corner of the stub of each ballot shall be printed or stamped, the number of said stub and ballot. The stub shall bear the same number as the ballot, and such numbering shall begin with number "1" in each precinct. It further provides that all ballots for general elections shall be upon white paper of such thickness as will render it impossible to look at the back of a ballot and tell for whom it is voted. Section 9, p. 337, contemplates that the ballots shall be bound in a book.

Plaintiff alleges in its petition that the special election board provided for did not print and furnish the ballots used in this election in accordance with the requirements of the statute, in that:

"Said ballots were ordered printed by said board without specifications, bidding, or letting of contract as required by law. No specified number of ballots were printed, and no oath as to printing was made or filed, as required by law. The exact number of ballots printed for each precinct is not shown, and no record of same exists. That said ballots were not printed with a stub, as required by law; nor were said ballots or stubs numbered, and that said special election board had no knowledge of the number of ballots sent to each precinct, and that said special election commissioners had no method of determining whether the consecutive ballots were voted, destroyed, or smuggled outside the voting place. That said ballots were not placed in a book and bound, as required by law. That many voters on receiving their ballots were allowed to leave their ballots, and go outside the voting place for instruction, and that there was no method of determining whether or not such voter voted the ballot given him, or another placed in his hands, already marked by persons outside the voting place. That by reason of such irregularities the election, pretended to be held on December 8, 1908, was not held in substantial compliance with the law for holding same, and that the opportunity for fraud was not guarded against, as required by law, and that such election was illegal."

It will be noted that the foregoing allegations of irregularities relate solely, so far as any definite and specific averments of irregularities are concerned, to derelictions on the part of the election officials. There is no charge that any voter perpetrated any fraud and no fact stated upon which it can be fairly claimed fraud was committed. The sum and substance of the charges made is that the election officials, charged with the duty of providing ballots to be cast by the electors, failed to perform some of the duties which the law imposed on them, or in the manner in which the law specified they should be performed. The answer of the defendants admits that the ballots were not prepared in the manner provided by law, and avers that:

"The county election board, consisting of three members, after receiving official notice from the Governor of the time of the election, could not comply literally with the requirements of the law, as the only printing press in the county was not prepared to print the ballots in the form prescribed by law, but that the members of said board agreed on a form to be used which could be printed in the county, and adopted the form that was used in all of the precincts of the county at said election; that an estimate was made as to the number of ballots required in each precinct, and this number was printed, with the same number of the precinct on the ballot, and delivered to the precinct election officers, with a statement as to the number of ballots prepared for that precinct, and that when the polls were closed, the precinct election officers burned all the unused ballots; that the ballots throughout the county were uniform, and agreed to by three members of the county board, two of whom were favorable to the election of Grove as the permanent county seat of said county. They further deny that said election was not held in substantial compliance with the law for holding same, and they deny that there was any fraud committed at said election in consequence of their failure to comply literally with the requirements of the law in preparing the ballots, and they deny that there was any opportunity for fraud because of a failure to comply literally with the requirements of the law in preparing said ballots."

It is certainly contemplated by the election law that the officials shall prepare, provide, and distribute the ballots to be used

in general and special elections in strict accord with directions given in the statute; and, while the question is not now regularly presented to us, yet we have no doubt that upon timely application all of these different provisions would be held, as to the officials themselves, mandatory. To this point the Supreme Court of Indiana, in the case of *Jones v. State ex rel. Wilson,* 153 Ind. 440, 55 N. E. 229, said in the syllabus:

"All provisions of the election law are mandatory if enforcement is sought before the election in a direct proceeding for that purpose; but after election they should be held to be directory only, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared in the statute that the particular act is essential to the validity of an election, or that its omission shall render it void."

The Supreme Court of the state of Kansas, in a well-considered opinion written by Mr. Justice Mason (*Peabody v. Burch et al.,* 75 Kan. 543, 89 Pac. 1016), says in the syllabus:

"Although mandatory provisions of the statute are disobeyed in the preparation of the official ballot, the will of the voters expressed by means thereof cannot, on that account, be disregarded."

The Supreme Court of California in the case of *Russell v. McDowell,* 83 Cal. 70, 23 Pac. 183, said in the syllabus:

"It is only those provisions of the election laws relating to the time and place of holding elections, the qualification of voters, and such others as are made essential prerequisites to the validity of an election that are mandatory. All others are directory merely, and an honest or mistaken disregard of them, not resulting in manifest fraud, will not justify the rejection of the entire vote of a precinct; but a neglect of directory provisions designed to prevent fraudulent voting, followed by actual fraud of that character sufficient to throw a doubt on the result of the election, is ground for rejecting the entire vote of a precinct, where there is no means of purging the poll."

In the case of *Kellogg v. Hickman,* 12 Colo. 256, 21 Pac. 325, which was an election contest case, it appeared that at a certain

precinct, the ballots provided therefor failing to reach the same in time, the electors thereof provided ballots printed on yellow paper, and which in no wise conformed to the requirements of the law. As in the case at bar there was no claim that there was any fraud intended or perpetrated thereby. On objections being made to the counting of these ballots, the court, speaking through Stallcup, Commissioner, said:

"I see no warrant in the statute for deducting these votes from the count. The courts are without authority to declare such penalty against the voter until the Legislature shall have declared that the act of voting such ballot shall be unlawful, and that such ballot, if voted by the elector, and received by the judges, shall not be counted, and, in the absence of legislation to this effect, the courts may not declare as much. The right to vote under our Constitution is a vested constitutional right, with no condition imposed as to the manner of exercising the right, except that the vote be by ballot. * * * It will be seen that the enactment under consideration does not in terms prohibit the elector from voting a ticket printed on paper different from that prescribed; nor does it declare against the counting or receiving of any such ticket. The parties voting at an election are considered by some courts as parties to a contest of this kind. *State ex rel. Hopkins v. Olin,* 23 Wis. 319; *People v. Pease,* 27 N. Y. 45, 84 Am. Dec. 242. However this may be, it will be conceded that the rights of the electors voting are necessarily involved in contests of this kind; that their rights in the premises may not be ignored; that, to warrant the courts in depriving them of their votes as a result or penalty for having voted ballots printed upon paper different from that prescribed, there must be legislative expression to that effect. It is contended that it was the intention of the Legislature, by the enactment under consideration, to deprive them of their votes when so cast, and that such intention is apparent from the act, notwithstanding the want of expression in this regard, and that such intention should govern, in order to give effect to this provision of the act. It was stated in the oral argument that this section 1281 (Gen. St. Colo. 1883) was taken from the Ohio act upon the same subject. Upon examination of that act I find that it declares that it shall be unlawful to publish, distribute, or vote a ticket different from the ticket prescribed. · The prohibition against the voter, being omitted in the act here, is significant in that it tends to show that the Legislature here did

not intend to defeat the vote of an honest voter honestly voted, even if his ticket was of different paper from that prescribed, but did intend the provision in this regard for his protection in the premises; that is to say, the legislative intention to be gathered from the language used seems to be that no ballot except the kind prescribed should be printed or furnished to the voter, to the end that his ballot might be secret, and that he might be clear of restraint or imposition of any kind in the exercise of his right of suffrage. Upon a fair consideration of the statute it is not apparent that the legislative intent was to nullify such votes."

This court in the case of *State ex rel. Edwards v. Millar,* 21 Okla. 448, 96 Pac. 747, considering a question similar to the one now before us, held in the syllabus:

"The purpose of that part of section 2963, Wilson's Rev. & Ann. St. 1903, which provides that the election officers, whenever a question is to be voted on by the electors of a city or town, shall cause a brief statement of the same to be printed on the ballot, and the words 'Yes' and 'No' under the same, is to prevent the use of any other than official ballots, and not to condemn as invalid official ballots which have been furnished to the electors by election officers charged with that duty, for some oversight or error on their part."

The statute under which the election in question in that case was held (section 2963, Wilson's Rev. & Ann. St. 1903) provided that in elections of that character the words "Yes" and "No" should appear under the question submitted, and that the elector might indicate his preference by stamping at the place designated in the front of each word. On the ballots prepared for this election the officials placed the squares to the left of the question to be voted on, and under the squares placed the words "Yes" and "No," instead of placing the squares under the proposition to be voted on and placing the words "Yes" and "No" at the right of the squares as provided in the statute just noted. Exception was taken to the result of the election held on such ballots, and Justice Kane, who prepared the opinion for the court on this proposition, said:

"The defendants contend that the election is invalidated by this variation in the form of the ballot made by the election offi-

cers. The authorities do not seem to support this contention. In the case of *People v. Board of Canvassers,* 105 App. Div. 197, 94 N. Y. Supp. 996, it was contended that all the ballots cast at an election to remove a courthouse site were void because not in the form required by law. The objection was that certain directions with regard to voting were printed on the ballots in addition to those required by statute. The statute provided that 'none but ballots provided in accordance with the provisions of 'the election law should be counted.' The court held that the purpose of that provision is to prevent the use of any other than official ballots, and not to condemn as invalid official ballots which have been furnished to the electors by election officers charged with that duty for some oversight or error on their part. The court further held that, even though they were inadvertently or wrongly used, the ballots would not for these reasons be void, and quotes the following from the opinion of Mr. Judge Andrews in *Hirsh v. Wood,* 148 N. Y. 143, 42 N. E. 537: 'We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake or even the willful misconduct of election officers in performing the duty cast upon them. The object of election laws is to secure the rights of duly qualified electors, and not to defeat them. Statutory regulations are enacted to secure freedom of choice and to prevent fraud, and not by technical obstructions to make the right of voting insecure and difficult.' In *State ex rel. Brooks v. Fransham,* 19 Mont. 273, 48 Pac. 1, it is held that, where electors vote the official ballots supplied to them by the judges of election, their legally expressed will cannot be overthrown where they are not at fault by the fact that the public officers who prepared the ballots in some way neglected his or their duty. The case of *Thomas v. Kent, Circuit Judge,* 116 Mich. 106, 74 N. W. 381, was one of mandamus to compel the circuit judge to dissolve an injunction restraining the submission to electors of the question of borrowing money to erect a pauper insane asylum. It was admitted that the ballots prepared were not literally in accord with the form prescribed by statute, but the court says that they gave the voter information as to the nature of the propositions, which the prescribed form would not do, and held the statute directory only. *Merrill v. Reed,* 75 Conn. 12, 52 Atl. 409, was a petition for a recount of ballots cast at an election. The statute provided that the Secretary of State should designate the size and style of type to be used. The designation was made and the ballots printed, in compliance with such instructions, ex-

cept that the type was slightly different. It was held that such ballots should be counted. In *Kulp v. Bailey,* 99 Tex. 310, 89 S. W. 957, a name was improperly placed upon the official ballot, and it was held that, inasmuch as the election had been conducted in good faith, the ballots should be counted. * * * In the case at bar there is no allegation in the petition, nor is it contended by counsel in their brief, that there was the least semblance of fraud in the election, or that the exact will of the people of the city of Norman was not honestly and fairly expressed by the vote cast. This being true, we believe it to be contrary to reason, as well as to the great weight of authority, to invalidate the election on the ground urged by the defendants' first contention."

Other cases supporting this doctrine are *Lindstrom v. Board of Canvassers of Manistee County,* 94 Mich. 467, 54 N. W. 280, 19 L. R. A, 171; *Miller v. Pennoyer et al.,* 23 Or. 364, 31 Pac. 830; *Kirk v. Rhoads,* 46 Cal. 398, 399.

So we see that, in the absence of a mandatory provision of the statute visiting upon the elector the penalty of having his vote disregarded for casting a ballot so prepared, or a clear allegation that fraud sufficient to change (or at least sufficient to show a strong probability thereof) the result of the election, such ballots cast ought to be counted. They were uniform throughout the county—no advantage to either side appears to have followed their use—and, in the absence of the elements above noted, they will be held valid.

Plaintiff for its third cause of action alleges that the place called Jay was not such a place as should have been recognized by the Governor with any standing in the lists as its competitor; the averments of the petition being as follows:

"That on or about October 1, 1908, a pretended plat was filed in the office of the register of deeds of Delaware county, at Grove, a certified copy of which is hereto attached marked 'Exhibit D,' and made a part hereof. That the purpose of said pretended plat, or the filing thereof, does not appear. That neither at the time of the filing of said pretended plat, nor on December 8, 1908, nor at any time prior to December 8, 1908, was there any house, building, spring, mark, name, or any sign of any kind or character by which the lands therein described might be distinguished

from any other lands anywhere in the county of Delaware, except as one might carefully locate same by survey from the government description and marks. That at the time of filing said pretended plat the name 'Jay' meant nothing to the voters of Delaware county, and did not signify any city, town, or place. That there is not now, nor ever has been, any city, town, or place definitely known and commonly understood as 'Jay,' and that there was not on December 8, 1908, nor prior thereto, any place whatever generally known as 'Jay,' and that at the present time any place at or near the center of the county of Delaware is as commonly known as 'Jay' as the lands described in said pretended plat, and that very few persons have ever been in the locality of said described lands and have a common understanding as to the point intended. That the voters of the election of December 8, 1908, were compelled to rely on hearsay as to the location of the place alleged to be so named. That on account of the short time after the filing of the said pretended plat until December 8, 1908, the voters of said county were misled in large numbers as to what place was intended by 'Jay,' and that, the county being populated by fullblood Indians in a large measure, they were easily deceived, and that it was impossible for the great portion of the voters of said county to ascertain for themselves the location of the lands described in said pretended plat, and that, there being a popular spring some two miles north of the lands described in said plat, known as 'Muskrat Springs,' many voters were misled and induced to vote for 'Jay' in the belief that 'Jay' was at Muskrat Springs, where was good camping ground. That it is not now known, nor can it be determined, that the lands described in said pretended plat marked the 'Jay' for which the votes were cast at the said pretended election, and that, so far as may be ascertained, Muskrat Springs, was most generally known on December 8, 1908, as 'Jay,' and plaintiff alleges the fact to be that more than 100 voters in said county did on December 8, 1908, vote for some place other than the lands described in said plat as 'Jay.' "

The Constitution provides (paragraph a, § 6, art. 17) that the Governor shall cause to be placed upon, and cause to be voted at, the election the names of such towns as may, more than 20 days prior thereto, file with him verified petitions therefor, and that the word "town" shall be construed to mean "town," "city," or "place."

Referring now to the answer, it seems to us that if the fortunate competitor in this controversy bearing the cognomen of "Jay" cannot rise or aspire to the dignity of a "city" or "town," then under the allegations of the answer it would properly be embraced within the term "place." Of it the answer to which this demurrer is filed says:

"That prior to the date of the proclamation for the election of a permanent county seat of said county the owners of the land at Jay caused the same to be platted and surveyed, and caused the same to be filed with the recorder of deeds for Delaware county, at Grove, designating the place as 'Jay,' and that on October 2d, after the proclamation had been issued, a public picnic was held on the ground, which had been previously extensively advertised throughout the county, and that a large number of the voters of the county were present, and that on said occasion the persons owning the land had a public auction of the town lots on the premises, and public notice was given of the metes and bounds of the town, and that lots, blocks, alleys, and streets were at said time surveyed and laid out. Defendants, therefore, state that at the time of said election the location of the town of Jay was well known to the voters of the county."

Of the word "place" the Supreme Court of Montana, in the case of *State v. Thomas, Clerk,* 25 Mont. 226, 64 Pac. 503, says:

"The word 'place,' in popular usage, is a very indefinite term. It is used of an area or portion of land marked off by boundaries, real or imaginary, as a region, locality, site, spot."

And of it the Supreme Court of South Dakota, in the case of *Fall River County v. Powell et al.,* 5 S. D. 49, 58 N. W. 7, says:

"It is not indispensable that a settlement or locality to be selected as 'the place of the county seat' shall have definite and exact topographical boundaries. A particular settlement known as 'Hot Springs' may be selected as 'the place of the county seat,' although it may be at the time unplatted, and have no fixed and definite exterior boundaries."

Considering, then, the way the word is used and its context in connection with its meaning as given in the foregoing authorities, we believe we are justified in responding to the insistence of counsel for defendants in holding that the answer states a defense to

the averments of the petition. The organization interested in having a "place" voted for as a county seat should be held, however, to the duty of giving correct and accurate information to the voters of its location. It should not, by any dereliction or failure in this regard, be permitted to enjoy the benefit of votes which the voter intended to cast for some other point, or which he might have cast for its competitor, or not cast at all, had he been correctly advised.

We now come to the fourth and last cause of action stated in plaintiff's petition. This is as follows:

"For its fourth cause of action　*　*　*　plaintiff says that on and before the day set for holding said election, and for the express purpose of influencing the qualified electors of said county to vote for Jay, certain lots described in said pretended plat were sold, bargained, and given away, or agreed to be sold, bargained, or given away to Carlton Gray, T. E. Grider, and various and sundry other persons for the purpose and with the intent to induce said persons to use their influence to have the county seat of said county voted to that point. That on the day of said election, and prior thereto, it was represented and promised by said Claud L. Washbourne, Jr., Si Hardy, and others that if Jay became the county seat, a certain tract representing the square would be given to the county for a county courthouse and jail, and that they would build, or cause to be built, a courthouse and jail without expense to the county, and would rent same to the county for much less than the cost of the rent of the present courthouse and jail, all of which representations and promises were made for the purposes of inducing voters to cast their ballots for 'Jay.' That by reason of said agreements, representations, and promises many persons, to wit, 100 or more, were induced to vote for Jay who would otherwise have voted for Grove or not at all, and that said agreements, representations. and promises were in violation of law, and that Jay did by reason of said bribery receive a majority of 98 of the votes cast, as shown by the returns of the precinct canvassing boards, and that therefore said election was illegal."

To this the defendants have filed their answer, which is practically a general denial.

In many of the states the question raised by this pleading

has been before the courts, and passed upon, and, so far as our investigation has gone, in each instance the courts have held that offering to give courthouse sites, buildings, and other property to the county in consideration of the citizens thereof voting to locate the county seat at the town or place making the offer did not violate the bribery statutes of these states, nor contravene their public policy. A few of such cases may be noted as follows: *Wells et al. v. Taylor et al.*, 5 Mont. 202, 3 Pac. 255; *Hall, etc., v. Marshall, etc.*, 80 Ky. 552; *Dishon v. Smith*, 10 Iowa, 212; *State ex rel. Bill v. Elting et al.*, 29 Kan. 397. The doctrine in the foregoing cases is well stated in the syllabus of the case of *Wells et al. v. Taylor et al., supra,* by the Supreme Court of Montana, as follows:

"The offer of a public building if a county seat is changed is in no sense bribery; the building is a benefit to the public, and not to individuals, and the party to be influenced is a whole county."

The same condition, however, does not exist in Oklahoma as exists in the states to which reference is made above, for in section 7, art. 17, of the Constitution, which contains the provisions relating to elections for changing, removing, or relocating of county seats, it is specifically provided that:

"Any person or corporation offering money or other thing of value, either directly or indirectly, for the purpose of influencing any voter for or against any competing town in such election, shall be deemed guilty of bribery."

By this provision it will be noted that Oklahoma has specifically declared to be bribery the doing of the things which, in the absence of such statute or constitutional provision, the other states referred to have held did not under their laws constitute bribery.

The question now arises whether or not such a course of conduct will avoid the election, or merely the votes influenced by the offers made. To our minds the latter result, and not the former, would follow. McCrary on Elections (4th Ed.).§ 216; *State ex rel. Hopkins v. Olin*, 23 Wis. 309, 327; *Cowan v. Prowse*, 93 Ky. 156,

19 S. W. 407, 14 Ky. Law Rep. 273; *Carrothers v. Russell,* 53 Iowa, 346, 5 N. W. 499, 36 Am. St. Rep. 222; *State ex rel. Attorney General v. Collier,* 72 Mo. 13, 19, 37 Am. Rep. 417. In the case of *Cowan v. Prowse, supra,* the Supreme Court of Kentucky in the syllabus says:

. "A vote obtained by a bribe is a bad vote, and should, upon proper proof, be rejected by a tribunal trying a case of contest; a judgment of conviction for the offense not being necessary in order to exclude the vote."

The Supreme Court of Wisconsin, in the case of *State ex rel. Hopkins v. Olin, supra,* speaking to the same proposition, says:

"In our form of government, where the administration of public affairs is regulated by the will of the people, or a majority of them, expressed through the ballot box, the free exercise of the elective franchise by the qualified voters is a matter of the highest importance. The safety and perpetuity of our institutions depends upon this. It is therefore particularly important that every voter should be free from any pecuniary influence. For this reason the attempt by bribery to influence an elector in giving his vote or ballot is made an indictable offense by statute. Rev. St. c. 169, § 37. The payment or promise of money or other valuable consideration for the giving of a vote, no doubt constitutes the offense of bribery, or attempt to bribe, within the meaning of the statute. Can a vote thus obtained, in direct violation of the statute, be considered a valid or legal vote? If it can, then the very object of the statute, which is that it shall not be so obtained, is defeated."

From the foregoing it will be noted that the issues are narrowed down to two propositions: First, were the electors without their fault innocently misled or mistaken as to the location of Jay, through the fault of its committee, and voted for it under the mistaken belief that it was in fact located at another place; and, second, were the offers pleaded made by Jay or its authorized committee or agents, and if so, were they made with the intent and for the purpose of influencing the voters to vote for Jay, and in both instances did these matters charged have the effect of changing the result of the election? Thus causes 1 and 2 are eliminated. Plaintiff may, however, if it desires, amend as to

them, and have the usual time to reply to causes 3 and 4, and after the issues are made, the parties may agree upon a referee and suggest his name to the court. If agreement thereon cannot be reached, then the court will appoint, and the evidence may be taken by him. The referee so selected will be required to make his report include both findings of fact and conclusions of law.

All the Justices concur.