## CITY OF BLACKWELL v. CITY OF NEWKIRK *et al.*

No. 570.   Opinion Filed January 30, 1912.

(121 Pac. 260.)

1.   **COUNTIES—County Seat—Location—Submission of Question to Popular Vote.** The fact that a partisan of one of two cities that were candidates for the location of a county seat had, on the day of election, at his place of business, a block from the polling place in one precinct, whisky, which he dispensed freely, promiscuously, and indiscriminately to some of the voters after they had voted, and to others who were not voters, where it is not shown that such whisky had been promised to the voters before casting their ballot, for the purpose of influencing them in voting, and some of the voters did not receive whisky, is not sufficient cause to require, in a contest of said election, the entire vote cast at said precinct to be rejected.

2.   **SAME—County Seat—Location—Submission of Question to Popular Vote—"Swear."** At a county seat election, voters at several precincts, on entering the polling places, were asked by the clerk the questions necessary to enable the clerk to fill out the blanks in the voter's affidavit required by section 12, art. 4, c. 31, p. 382, Sess. Laws 1907-08. The voter having answered fully, the clerk filled out the blank in the affidavit; whereupon the voter, in the presence of the special election commissioner, signed the affidavit, after which the special election commissioner, who is authorized by law to administer oaths to voters at such elections, explained the affidavit to the voter, and asked if he understood same to be his affidavit of qualification as a voter, or asked if he understood he was signing an affidavit that he was a legally qualified voter, to which the voter answered, "Yes," and the election commissioner thereupon signed his jurat upon the affidavit, and the voter was given a ballot and permitted to vote. **Held** that, by reason of section 2182, Comp. Laws 1909,

said acts on the part of the voter and of the election officers constituted a swearing by the voter to said affidavit, as required of him by said section 12, **supra.** Following **Inc. Town of Checotah v. Inc. Town of Eufaula,** infra, 119 Pac. 1014.

3.    **SAME—County Seat—Location—Geographical Center of County.** The Chilocco Industrial School reservation constitutes part of the geographical territory of Kay county, and the Secretary of State, in determining the geographical center of said county, did not err in considering said reservation as a part of the county.

4.    **SAME—County Seat—Location—Geographical Center of County.** To ascertain the distance between the geographical center of a county and the nearest corporate limits of a city, as authorized by section 6, art 17, Constitution, the measurement is to be made upon a straight line between said points, and not by the usual traveled way.

5.    **MUNICIPAL CORPORATIONS—Extent of Territory—Proceedings for Annexation of Territory—Collateral Attack.** Where a city of the first class, acting under section 458, Wilson's Rev. & Ann. St., enacted an ordinance annexing certain additions to its corporate limits, and continuously for about nine years thereafter exercised municipal authority over the annexed territory, levied and collected taxes thereon, constructed public improvements thereon, and did all other things incidental to maintaining a municipal government thereon, and the validity of such annexation has never been questioned by the state, a rival city, in a proceeding to contest a county seat election, cannot collaterally attack the validity of the ordinance or of the proceedings by which the additions were annexed to the municipal corporate limits.

6.    **COUNTIES—County Seat—Location—Geographical Center.** The fact that a certificate of the Secretary of State, showing the geographical center of a county, executed by virtue of section 6, art. 17, Constitution, was issued before an election was held under said section for determining the permanent location of a county seat does not render such certificate invalid.

7.    **SAME — County Seat—Location—Geographical Center.** Section 6, art. 17, Constitution, does not require that the distance between the geographical center of the county and the nearest corporate limits of any city or town shall be determined by measurement made by the Secretary of State, but such measurement may be made by other persons, whose testimony is competent to establish such distance.

(Syllabus by the Court.)

Original action by the City of Blackwell against the City of Newkirk and others to contest a county seat election. Report of referee in favor of defendants affirmed.

*John S. Burger,* City Atty., *J. L. Pancoast,* and *Dale, Bierer & Hegler,* for plaintiff.

*W. A. Ledbetter, G. A. Chappell,* City Atty., *C. L. Pinkham, J. F. King,* and *Charles J. West,* Atty. Gen., for defendants.

HAYES, J.   In pursuance of a provision of  section  6, art. 17, Constitution, and by virtue of a call and order of the Governor, an election was held in Kay county on the 2d day of December, 1908, at which the city of Blackwell and the city of Newkirk were voted upon as candidates for the permanent county seat of Kay county.   After the returns of said election had been made to the Governor of the state, as by law provided, the Governor canvassed the votes, and declared that it was shown by said returns that the city of Blackwell received 2,656 votes and the city of Newkirk received 2,707 votes for the permanent county seat of Kay county, making a total vote cast at said county seat election of 5.363.   Thereafter, within the time allowed by law, plaintiff, the city of Blackwell, filed in this court its petition, and later its amended petition, contesting said election.

In the amended petition, two causes of action are attempted to be alleged.   The first cause of action alleges various grounds of contest, set out in separately numbered paragraphs; the material ones of which are as follows:   First, that 1,221 illegal votes were cast at said election, and that the illegality thereof consists in that each of the 1,221 voters casting said votes received a ballot and cast his vote at said election without having been sworn to the affidavit prescribed and required by section 12 of article 4 of chapter 31 of the Sess. Laws 1907-08; that said 1,221 illegal votes were cast in the following township precincts:   North Vernon township, 89 votes; Cross township, 172 votes; Kildare township, 150 votes; Newkirk township, 202 votes; Waltham township, 195 votes; Longwood township, 108 votes; Beaver township, 108 votes; Dale township, 210 votes; that of the said 1,221 alleged illegal votes, 1,134 were cast for the city of Newkirk and the other 87 illegal votes for plaintiff; that said illegal votes, respectively, should be deducted from the number found and declared by the Governor to have been received by the city of New-

kirk and plaintiff, which would leave 4,142 as the total number of legal votes cast at said election, of which the city of Blackwell received 2,569 and the city of Newkirk 1,573, making a majority for the city of Blackwell of 996 votes of the total number of votes cast, and 83 votes more than 60 per cent. of all the votes cast at said election.

In the second paragraph, it alleges that there was also illegality in the votes cast at the election in Beaver township, in that at said election one Bill Cullison, who was a partisan of the city of Newkirk, was permitted by the election board in said township to establish and keep intoxicating liquors within 50 feet of the polling places, and was allowed to furnish unlawfully intoxicating liquors to persons voting at said election, prior to their voting, with intent on his part to influence said voters in favor of Newkirk; and that he did, by the use of liquors, influence many of the votes cast in said precinct. The exact number of votes so influenced, and by whom cast, plaintiff declares itself unable to allege in its petition.

By a third paragraph, it is alleged, as a second ground of attack on some votes cast in Newkirk township, that twenty of said votes cast in that precinct for Newkirk were illegal and should not have been counted, because the voters casting the same were persons residing in what is known as the "Chilocco Indian Industrial School Reservation," located in the northern part of said county; the same being a tract of land reserved by executive order, dated July 12, 1884, for use of and in connection with the Chilocco Industrial School, in the Indian Territory.

By a fourth paragraph, it is alleged that an unlawful agreement was entered into between two of the county commissioners of Kay county and the electors of Ponca City, in said county; that said commissioners were to build a bridge across the Arkansas river, near Ponca City, in consideration of which the electors of Ponca City were to vote for the city of Newkirk at the county seat election; and that by reason of said promise and agreement the voters in the various wards of Ponca City, in the number of 425, voting for the city of Newkirk, were unlawfully corrupted and influenced to vote for the city of Newkirk.

As a second cause of action, plaintiff alleges that the Secretary of State had theretofore attempted to determine the geographical center of Kay county and the distance by measurements from said center to the nearest corporate limits of the city of Newkirk as the same existed on the 21st day of January, 1907; and that on the 17th day of June, 1908, he made his certificate and attached thereto a plat of said county, a copy of which is filed with the petition as an exhibit thereto. As alleged in the petition, this certificate of the Secretary of State shows the geographical center of Kay county to be at a point which makes the nearest corporate limits of the city of Newkirk seventeen-hundredths of a mile more than six miles from said geographical center. Plaintiff alleges that afterwards the Secretary of State made another plat and certificate, by which the geographical center of said county is located at a point which makes the nearest corporate limits of the city of Newkirk 5.83 miles from said geographical center. Plaintiff alleges that the Secretary of State, in making said second plat and certificate, took into consideration, as a part of Kay county, the lands occupied by the government of the United States for the purpose of an industrial school, and generally known as the "Chilocco Industrial School Reservation," which has never been opened to settlement, and alleges that said reservation never became a part of the territory of Oklahoma, has never become and is not a part of the state or of Kay county, and prays that this court require, if necessary, the Secretary of State to determine again the geographical center of Kay county, and in doing so to exclude from the boundaries and body of said county the lands embraced in said reservation.

To all that part of the petition alleging a second cause of action, a demurrer of the defendant was sustained. No written opinion at the time of sustaining the demurrer, setting forth the reasons upon which the court reached its conclusion, was prepared; but it was then announced that when judgment was finally rendered in the cause, the reasons upon which the court based its conclusion upon this question would be given in its final opinion.

Defendant thereupon filed an answer, denying all the allegations constituting the first cause of action set up in plaintiff's

petition, and, further answering, alleged that all of the 1,134 votes, charged in the petition to be illegal votes cast for the city of Newkirk, were cast at said election by voters legal and qualified in all respects, and that all of them did subscribe to the affidavit required by law, and did swear to same; and further alleged that the geographical center of Kay county is within six miles of defendant's nearest corporate limits as they existed on the 21st day of January, 1907.

To this answer, plaintiff filed a reply, again setting up the second cause of action originally alleged in its petition. A demurrer to this reply was sustained, and the cause was thereupon referred to a referee to hear evidence and to report his findings of fact and conclusions of law, which has been done. Exceptions, filed to said report, respectively, by plaintiff and defendant, were overruled by the referee, after which the report was filed in this court. Defendant thereupon filed its motion to confirm said report and for judgment in its favor. Plaintiff filed its motion to set aside the report and to grant to it a new trial. Upon these motions, the cause has been briefed and orally argued, and the propositions hereinafter considered are presented by these motions.

The referee found that, as shown by the election returns, plaintiff and defendant received, respectively, the number of votes above mentioned, as declared by the Governor; but he also found that 89 votes in North Vernon township, 2 votes in Newkirk township, three votes in Waltham township, one vote in Longwood township, making a total of 95 votes, were illegally cast, for the reason that the voters did not make the affidavit of qualification as required by the statute, and found that said 95 votes should be deducted from the total votes cast for the city of Newkirk, which would leave 2,612 legal votes for that city.

Upon the charge that two of the county commissioners had bribed or influenced the electors of Ponca City to vote for defendant, the city of Newkirk, by an agreement or promise to rebuild the bridge across the Arkansas river, the referee found that no evidence was offered tending to establish this charge; and this finding is not complained of.

On plaintiff's charge that whisky was used in Beaver township by a partisan of defendant to influence the voters at the election, and that same was used and dispensed within 50 feet of the polling place, the referee finds that one Bill Cullison, of said township, had five gallons of whisky in his place of business in the town of Hardy, in that township, which he gave to the voters on election day; that it was dispensed promiscuously and indiscriminately, and was consumed by divers persons, including voters; but he found that there was no direct evidence of any voter taking a drink prior to his voting. He finds that the whisky was furnished to Bill Cullison by the citizens of Newkirk, and that he was a partisan of Newkirk; but he fails to find that said whisky was used for the purpose of influencing the voters by giving the same to them before their voting, or promising to do so; and he further finds that the election at said precinct was conducted in an orderly and peaceable manner, and no evidence of disturbance at the polling places was introduced.

Counsel for plaintiff do not contend in their brief that the finding of the referee upon this proposition should be more favorable to them than it is. The sole contention is that upon the facts found the entire vote of that precinct should be rejected, because of the fact that, although it is not shown that any voter who received whisky (and many of them did not) received it prior to the time he voted, or was promised whisky for the purpose of influencing his vote, whisky was had and dispensed by Cullison on that date, and the election must have been influenced and contaminated. No authorities are cited by counsel to support this contention, and we think there are none. While the whisky may have been furnished by the citizens of Newkirk with the ultimate purpose and design that it should be used by Cullison to influence voters at the election, still, if it was not used by him for that purpose, and had not the effect to influence and corrupt the voters in casting their ballots, the act of Cullison in having the whisky and dispensing it promiscuously among some voters after they had voted, and others who were not voters, at his place of business, about a block from the polls, although it be an unlawful act as to Cullison, should not result in disfranchising the entire

vote cast at this precinct. Mere intent by the partisan of a candidate to unlawfully influence voters at an election cannot operate to render void the votes of electors who were not influenced and affected by such intent. To hold otherwise would permit a zealous partisan of a candidate, or an unscrupulous opponent, to defeat the will of the electors of any precinct, or of an entire county, by offering a bribe before the election, or by bestowing favors upon some of the voters after they had cast their ballots, although the voters were entirely uninfluenced by the conduct of such persons.

It is well settled that all votes obtained by paying, giving, or offering to pay or give, anything of value to electors therefor are, upon proper proof, to be rejected by a court in a contest. Article 215, McCrary on Elections. But the votes of those who neither directly nor indirectly participated in the bribery or unlawful agreement, and who are not the recipients of any benefits of the unlawful conduct of him who attempts to influence corruptly any election, are not to be rejected. *Berry et al. v. Hull et al.*, 6 N. M. 643, 30 Pac. 936. If any of the voters in Beaver township were influenced by the conduct of Cullison in dispensing liquor in his place of business on that day, plaintiff should have directed its proof to showing who such voters were, and other facts tending to show that they were influenced by the conduct of Cullison. Upon such showing, it would be the duty of this court to reject such votes, but not to reject the entire box of that precinct. *Town of Grove v. Haskell*, 24 Okla. 707, 104 Pac. 56.

As to all other material issues of fact found by the referee, plaintiff complains that same are either not supported by the evidence, or are against the weight of the evidence. What weight the findings of the referee is to be given by the court in cases of this character was determined by this court, in *Town of Grove v. Haskell*, *supra*, to be that the referee's findings of fact are not conclusive upon this court, but will be accorded every reasonable presumption of being correct, with the burden on the party attacking the report to show that it is incorrect. The evidence in this case is voluminous, and upon many of the issues there is

considerable conflict. We have carefully read the record and find that it contains evidence to support the findings of the referee upon every essential issue found upon in his report. The witnesses were before him. The trial before the referee occurred more than a year after the election was held. Most of the facts yet to be considered relate to making out the affidavits of the voters before being given a ballot, and as to what was done by the voters and officers towards swearing the voters to such affidavits. The referee, having seen the conduct of the witnesses upon the stand, was in a much better position, from the manner in which the witnesses testified, to determine their interest or lack of interest, the reliability and accuracy of the memory of each witness as to the details of what occurred at said voting places on the day of the election, than we are able to determine from the record alone. We are unable to say that his findings of fact are incorrect; and we shall direct our further consideration to an application of the law to the facts as found by the referee.

Section 12, art. 4, c. 31, p. 382, Sess. Laws 1907-08, provides that every person desiring to vote at a special election for the permanent location of a county seat shall, before being given a ballot, permit the clerk to fill out an affidavit which the voter shall subscribe and swear to before the special election commissioner, after which he shall be given a ticket and be permitted to prepare same, and then he shall deliver his ballot to the special election commissioner, who shall, in the presence of the voter, deposit the ballot in a box, and shall deposit the affidavit in a box provided for that purpose. The form of the affidavit is required by said statute to be substantially as follows:

"State of Oklahoma,_____County_____ss.:

"_____, of lawful age, first being duly sworn, upon his oath deposes and says: That he is a male citizen of the United States or is of Indian descent, native of the United States, is over the age of 21 years,_____white_____colored_____, that he has been for one year last past a *bona fide* resident of said state, of said county six months and in_____precinct thirty (30) days next preceding this date; that he came to his present residence from _____, and is a legally qualified elector in said precinct on this day and has not voted in said election.

"Subscribed and sworn to before me this_____day of _____, A. D. 19____.

"_____
"Special Election Commissioner."

The statute requiring the voter to subscribe and swear to the affidavit is mandatory; and where the voter fails to do so his vote cannot be counted for the candidate for which it is cast. *In. Town of Westville et al. v. In. Town of Stilwell et al.,* 24 Okla. 892, 105 Pac. 664.

It is contended by plaintiff that all the voters of Kildare township, Newkirk township, Waltham township, Longwood township, and Beaver township failed to swear to the affidavits prescribed by this statute; and that the facts found by the referee as to what was done by the voters and the election officers in said township show that there was no swearing by the voter to the affidavit. What was done in these townships by the voter and the election officers, respectively, toward the voter's subscribing and swearing to these affidavits can best be stated by repeating the findings of the referee as to some of the townships in the exact language of the report, as follows:

"Kildare Township. I find that each and all of the voters in this precinct, upon coming into the polling place, was interrogated by the clerk as to the questions and blanks to be filled in the voter's affidavit, and the voter having fully answered the questions propounded by said clerk, and the said clerk having filled out said blanks in said voter's affidavit, and did so in the presence of the special election commissioner, and the special election commissioner then and there did explain the affidavit to the voter, and did ask the voter if he understood same as his affidavit of his qualifications as a voter, and did then and there, in the presence of the voter, sign the same, and the voter was then permitted to vote.

"Cross Township. I find when the voter presented himself to vote the clerk of the election asked of the voter the necessary questions to fill out the blanks in the voter's affidavit, and, the answers thereto being given, the blanks in the voter's affidavit were filled out by the clerk, and the voter then came before the special election commissioner and signed said voter's affidavit, and the special election commissioner then and there asked the voter if he understood that he was signing an affidavit that he was

a legally qualified voter, and the voter then and there answered that he did; whereupon the special election commissioner, in the presence of the voter, signed his jurat upon the said voter's affidavit, and thereupon the voter was given the ballot and voted."

Substantially the same things were found to have been done by the voters and election officers in Longwood township and in Beaver township; and, as to all these townships, the referee finds that each and every voter reasonably understood that he was being sworn, and that the election commissioner reasonably understood that the voter was swearing.

Section 2182, Comp. Laws 1909, reads as follows:

"The making of a deposition or certificate is deemed to be complete, within the provisions of this article, from the time when it is delivered by the accused to any other person with the intent that it be uttered or published as true."

Construing section 12 of the act regulating county seat elections in conjunction with section 2182, *supra,* this court, in *Town of Checotah et al. v. Town of Eufaula et al., infra,* 119 Pac. 1014 held that, where an elector at a county seat election, on entering the room, is informed by the judges that he is required to make an affidavit of his qualification before he can vote, and he thereupon gives information required to complete the affidavit, which is accordingly done, and after which he reads the affidavit, or the same is read and explained to him by the election judge, whereupon he signs his name thereto, and the affidavit is then delivered to the election commissioner for the purpose and with the intent on the part of the elector of receiving a ticket with which to prepare and cast his ballot at the election, and the election commissioner understood that this process constituted a swearing on the part of the elector, and the elector intended it as such, and the affidavit was delivered with the intent that it be taken and acted on as true, the affidavit was complete, and such act by the voter and the election commissioner constituted a swearing to the affidavit by the voter; and that his vote, on a contest, should be counted for the candidate for whom it was cast. The rule of the foregoing case was approved and followed in *Town of Grove et al. v. Haskell, supra.*

The facts found by the referee in the instant case, as to the procedure taken by the voter and the election commissioner in the foregoing townships, bring them squarely within the rule of the foregoing cases; and it must be held that the voters were sworn, and that their ballots should not be rejected for want of the affidavit required by the statute.

In Newkirk township, with the exception of two votes, it is found that there was a full compliance by the voters and the election officers with the statute; and there is evidence to support the finding.

In Waltham township, the voter was asked if he solemnly swore that he was one year in the state of Oklahoma, six months in the county, and thirty days in the precinct, to which the voter then and there answered, "Yes," and was thereupon by the commissioner required to and did sign the affidavit, and the election commissioner then put his signature to the jurat to the voter's affidavit. It is contended that because the election commissioner did not repeat the entire contents of the affidavit to the voter no oath was legally administered. A similar case of facts is presented as to one of the precincts involved in *Town of Grove et al. v. Haskell, supra,* where this question is decided adversely to defendant's contention.

As to the Dale precinct, it is found that there is no evidence tending to contradict the returns made by the election board; and that all of said votes in said township should be counted. Of this finding, no complaint has been made or argued in the brief of plaintiff's counsel.

It is not contended that the 95 voters who cast the votes rejected by the referee, because of the failure of the voters to make the affidavit required by the statute, were not qualified electors of the precincts in which they attempted to vote, or that they did not in good faith attempt to comply with the requirement of the statute, but omitted to do so on account of a misunderstanding of the statute on their part, or on the part of the election officers. While their votes cannot be counted for the candidate for which they were cast, they are to be considered in estimating the total number of votes cast at the election to de-

·termine whether either candidate received a majority of the votes cast. *In. Town of Westville et al. v. In. Town of Stilwell et al., supra; Town of Eufaula et al. v. Gibson et al.*, 22 Okla. 507, 98 Pac. 565. Neither plaintiff nor defendant, therefore, received a majority of the votes· cast at the election. The Constitution, after providing for elections at which it may be determined whether the county seat of any county shall be changed from the town designated by the Constitution as the county seat of such county, provides that:

"If a majority of all the votes cast in the county at such county seat election shall be in favor of any town, such town shall ˙thereafter be the county seat; Provided, however, that where the county seat named in this Constitution is within six miles of the geographical center of the county (said geographical center to be determined by certificate from the Secretary of State, and said distance to be determined by measurement from said geographical center to the nearest corporate limits of such county seat, as they existed on the twenty-first day of January, nineteen hundren and seven), it shall require sixty per centum of the total vote cast at such election by the competing town to effect the removal˙of such county seat, unless such competing town be more than one mile nearer the geographical center of said county, in which event a majority vote shall suffice." (Section 6, art. 17, Const.)

If neither of the two contesting towns is within six miles of the geographical center of the county, and neither secures a majority of the votes cast at the election, under the first clause of the foregoing constitutional provision, the election fails, and another election must be held. *In. Town of Ryan et al. v. Town of Waurika et al.*, 29 Okla. 655, 119 Pac. 220; *Town of Westville et al. v. Town of Stilwell et al., supra*. But the referee finds that the city of Blackwell is more than six miles from the geographical center, and that the city of Newkirk is nearer than six miles to said center. Under this finding, if it be correct, the result of this election is determined by the application of the proviso in the foregoing constitutional provision. Whether Blackwell's failure to secure 60 per cent. of the total vote cast is alone sufficient to locate the county seat permanently at Newkirk, or it is necessary, also, that Newkirk should have secured 40 per cent. of the·total

vote cast, is unimportant to decide; for, in either event, the result of this election would not be changed, for Blackwell secured less than 60 per cent. and Newkirk more than 40 per cent.

In ascertaining the distance from the corporate limits of the respective candidates to the geographical center of the county, the referee took a point shown by a plat and certificate of the Secretary of State to be the geographical center of said county. The validity of this certificate and plat, because the Secretary of State in making them took into consideration the Chilocco Indian Industrial School reservation as a part of Kay county, was the question presented by the second alleged cause of action in plaintiff's petition, to which a demurrer was sustained.

The boundaries of Kay county are defined by the Constitution in the following language:

"Said county shall be and remain as it now exists under the territory of Oklahoma, until hereafter changed under the provisions of this Constitution. Newkirk is hereby designated the county seat of Kay county." (Section 7, art. 17, Cons.)

The boundaries of this county, as they existed under the territory of Oklahoma, were originally marked out and defined by order of the Secretary of the Interior, issued the 8th day of August, 1893. Said county, as its boundaries are defined in that order, includes as a part of its territory the Chilocco Industrial School reservation. It is contended by plaintiff that the Secretary of the Interior acted without authority in including said reservation within any county; that his act relative thereto is void; and that the reservation has at no time constituted any part of said county.

By section 1 of the Organic Act, it was provided:

"Whenever the interest of the Cherokee Indians in the land known as the Cherokee Outlet shall have been extinguished and the President shall make proclamation thereof, said outlet shall thereupon and without further legislation, become a part of the territory of Oklahoma." (Act May 2, 1890, c. 182, 26 U. S. Stat. at L. p. 82.)

The territory embraced in the county of Kay as was originally formed constituted a part of the Cherokee Outlet. On March 3, 1893, there was approved an act of Congress entitled

"An Act making appropriations for current and contingent expenses, and fulfilling treaty stipulations with Indian tribes, for fiscal year ending June thirtieth, eighteen hundred and ninety-four." Act March 3, 1893, c. 209, 27 U. S. Stat. at L. p. 612. Section 10 of this act appropriates a stated sum of money to be paid to the Cherokee Nation of Indians and further authorizes the Secretary of the Interior to contract to pay an additional sum to said nation for relinquishment of its right, title, and interest and claims to the lands embraced within the Cherokee Outlet. This section, in part, provides also:

"And said lands, except the portion to be allotted as provided in said agreement, shall, upon the payment of the sum of two hundred and ninety-five thousand seven hundred and thirty-six dollars, herein appropriated, to be immediately paid, become and be taken to be and treated as a part of the public domain. But in any opening of the same to settlement, sections sixteen and thirty-six in each township, whether surveyed or unsurveyed, shall be, and are hereby reserved for the use and benefit of the public schools to be established within the limits of such lands, under such conditions and regulations as may be hereafter enacted by Congress. * * *"

A succeeding part of the section provides that the lands embraced in the Chilocco Indian Industrial School reservation shall not be subject to public settlement, but shall, until the further action of Congress, continue to be reserved for the purposes to which they were set apart, and the President is authorized, by any proclamation he shall make in the opening of the lands for settlement, to make other reservations of lands for public purposes as he deems wise and advisable. The acceptance by the Indian tribe of the money appropriated by this act, except as to those lands allotted under the agreement ratified by the act, operated to relinquish the right and title of the Indian nation to the lands of the Cherokee Outlet, and the same became a part of the public domain of the federal government. The fact that some of these lands were reserved by the act from public settlement did not continue the title of the tribe thereto. The lands so reserved remained the lands of the federal government, reserved for the purposes specified. One of the results of this act, without

further legislation, was to make, by reason of section 1 of the
Organic Act, *supra,* the Cherokee Outlet a part of the territory
of Oklahoma. Section 11 of this act makes immediately available
a sum of money to pay the Tonkawa Tribe of Indians for all
their right and title to certain lands; and section 12 of said act
makes similar provision for the extinguishment of the Indian
title to certain lands of the Pawnee Indians. Section 13 makes all
the land acquired by the agreements referred to in sections 11
and 12 part of the public domain, and all of said land, except such
as is reserved, subject to be opened to settlement by proclamation
of the President at the same time and in the same manner, and
subject to the same conditions as provided by section 10 for the
opening of lands acquired from the Cherokee Indians. Section
14 of the act, in part, reads as follows:

"Before any of the aforesaid lands are open to settlement it
shall be the duty of the Secretary of the Interior to divide the
same into counties which shall contain as near as possible not
less than five hundred square miles in each county.    *    *    *"

This statute authorized the Secretary of the Interior to di-
vide the lands acquired under the provisions of sections 10, 11,
and 12 from the Cherokee, Tonkawa, and Pawnee Indian Na-
tions into counties. It is the contention of plaintiff that the
authority of the Secretary of the Interior extended only to the
division into counties of land, acquired from those tribes, opened
to settlement; but we do not so understand the act. "Any of the
aforesaid lands" mentioned in section 14 refers to the lands ac-
quired from these three Indian tribes, and "to divide the same"
refers to "aforesaid lands," not to lands opened to settlement. If
this statute be construed as authorizing the Secretary of the In-
terior to put within any county only lands opened to settlement,
then he was without authority to embrace within any county any
of the lands included in sections 16 and 36 in each township, be-
cause all these lands were reserved from settlement by the act;
and the character of their reservation was just as permanent, or
more so, than the reservation of the Chilocco Industrial School
reservation; for the Chilocco reservation was expressly reserved
until further action of Congress; whereas, no such condition is at-

tached to the reservation of sections 16 and 36. It would have been difficult, if not impossible, for the Secretary of the Interior to divide said lands into counties, so as to exclude sections 16 and 36 therefrom. No such meaning, we think, was intended by the act. But the Secretary was granted authority to divide into counties the lands to which the Indian's title was extinguished by the operation of this act, and to include therein lands reserved from settlement, as well as lands opened for settlement. The fact that the Secretary of the Interior did not include in the counties created by him some of the Indian reservations that lay within territory acquired cannot be taken as a construction by his department of the foregoing act as not authorizing him to do so; for it must be assumed from his act in including the Chilocco reservation within the limits of Kay county that he construed this statute as granting to him such authority. The division of these lands into counties, by which the boundaries of Kay county are made to include the Chilocco reservation, was acted upon by the President and recognized as valid in issuing his proclamation opening to settlement these lands. No change in the boundaries of Kay county was ever made by any legislative act or otherwise before the admission of the state. Counsel for plaintiff contend, however, that if the Chilocco reservation was ever a part of Kay county it has been taken therefrom by certain provisions of the Enabling Act and the Constitution.

The third paragraph of section 3 of the Enabling Act provides, in part, as follows:

"That the people inhabiting said proposed state do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal and control of the United States." (Act June 16, 1906, c. 3335, 34 Stat. 270.)

The terms and conditions of the Enabling Act were accepted by ordinance irrevocable, adopted by the constitutional convention. The foregoing provision is also to be found in the same

language in section 3 of article 1 of the Constitution. It is the contention of defendant's counsel that these provisions vest in the United States, for governmental purposes, exclusive jurisdiction over the Chilocco reservation, because the title to the land embraced therein is in the United States, and said lands have been reserved for the purposes of the federal government. If we assume, without deciding, that this provision of the Enabling Act and the Constitution has the effect, as contended by plaintiff's counsel, to give to the United States government exclusive jurisdiction over said reservation, it does not follow that said reservation does not constitute, geographically speaking, a part of the territory of Kay county. A county, as a political organization or municipal government, is a distinct thing from the territory embraced within the geographical limits of a county. It is not essential that the state or county shall have jurisdiction over every particle of land embraced within its territorial limits, in order that such land shall constitute a part of the state or county, geographically speaking. A somewhat similar question was involved in *Renner v. Bennett,* 21 Ohio St. 431. In that case was involved the territory occupied as a soldiers' home by the federal government, over which the federal government had, for a number of years prior to January 1, 1871, exclusive jurisdiction. On that date, Congress, by an act, released its jurisdiction over the lands occupied by the home to the state; but the same continued to be used and occupied as a soldiers' home by the federal government. The Constitution of Ohio required a year's residence in the state as a necessary qualification for an elector to vote at any election. At an election held less than a year after the enactment by Congress of the act relinquishing jurisdiction over the soldiers' home, the inmates of said home offered to vote, and one of the questions raised was whether said home had been within the state of Ohio, and whether the inmates thereof had been residents of the state for a period of one year. Upon this question, Mr. Chief Justice Welch, delivering the opinion of the court, said:

"These 105 inmates of the asylum were therefore residents and citizens of Ohio at the time of the election. Were they residents of the 'state,' for the full year, within the meaning of the

Constitution of Ohio? We think they were. In one sense, the 'state' is a territory. In another sense, it is a political organization. These inmates have resided for the whole year in the same place. Territorially, they and the asylum in which they reside have been all the time in the state. Politically, or, if I may so speak, jurisdictionally, both have been temporarily out of the state. The expression is used in both senses. It is used in the territorial sense in the agreed statement filed in the case. In favor of the right of suffrage, we think it safe and proper to give it that meaning in the Constitution. In the primary and popular sense, the asylum is and always has been in Ohio. It has never ceased to be part of the state of Ohio geographically, although the state's jurisdiction over it has been temporarily suspended."

We think the foregoing reasoning of the court in that case applicable to the case at bar. If the effect of the Enabling Act and the Constitution was to relinquish, for governmental purposes, exclusive jurisdiction to the federal government over the Chilocco reservation, such jurisdiction is to continue only until the title of the federal government shall have been extinguished or released, and then the jurisdiction thereof, for governmental purposes, will revert to the state government and its municipalities. The most that is effected by said provisions under plaintiff's contention is the suspension of the exercise by the state and its counties of governmental authority over any lands, so long as the United States retains title thereto. It may be gravely doubted whether these provisions have the effect contended for by plaintiff; but since, if such be their meaning, it cannot affect the final judgment to be rendered by this court, we forego a decision of this question. In harmony with the Ohio case, and supporting the rule announced in the language quoted, *supra,* from that decision, are the following: *State v. Kelly,* 76 Me. 331, 49 Am. Rep. 620; *Crook, Horner & Co. v. Old Point Comfort Hotel Co. et al.* (C. C.) 54 Fed. 604.

The center from which the measurement is to be taken in determining the vote necessary to remove the county seat is the geographical center, not the center of jurisdiction of the county government or of the county's population. The requirement that more votes shall be necessary to ·remove the county seat when the town designated as such by the Constitution is less than

six miles from the geographical center was made, no doubt, upon the theory that, as a general rule, a county seat located in the center of the territory of the county will be more nearly equally accessible to all the residents of the county than any other location; and that a removal from such location ought not to be effected by a bare majority. The distance around or across territory in a county which residents of the county have to travel, in order to reach the county seat or the center of a county, is made neither shorter nor longer by the fact that such territory is under the exclusive jurisdiction of the federal government, or under the concurrent jurisdiction of the state and federal government.

The finding that Newkirk is less than six miles from the geographical center of the county is based upon the evidence of the county surveyor, who testifies that by measurement upon straight line the nearest corporate limits of said city is 5.83 miles from the center of the county. Plaintiff contends that such distance is not to be measured upon a straight line, but upon the regular route of travel from the county seat to the center of the county, and in support thereof cites section 23 of the Organic Act of the territory of Oklahoma, as follows:

"There shall be reserved public highways four rods wide between each section of land in such territory, the section lines being the center of said highways."

Counsel insist that the foregoing statute constituted a measurement by section lines under existing surveys at the time of the adoption of the Constitution, and for that reason it was contemplated by the framers of the Constitution that the distance as thus measured should be adopted in determining the distance from the center of any county to the county seat designated by the Constitution. But the foregoing statute had no application to the east side of the state formerly constituting the Indian Territory, and it is a matter of general knowledge that public highways, at the time of the adoption of the Constitution, had not been established upon all the section lines of that portion of the state, and, in fact, but upon a very few of them, and such rule of measurement could not be applied in counties on that side of the state; nor can it be applied in counties formerly constituting a part of the

territory of Oklahoma, for the geographical center of a county is a point, and rarely would that point in any county fall in a public highway. It probably would not occur in a single county of the state. Likewise, the nearest corporate limits of a city would rarely fall in a public traveled highway. As a result, a measurement by such method would have to be upon the traveled way from some point near the center of the county to some point near the nearest corporate limits of the city. But the distance to be measured prescribed by the Constitution is between the "geographical center of the county" and "the nearest corporate limits." In the instant case, the center of the county does not fall in a traveled way, but upon private premises, to which there is no open route of travel. To get the distance by the system of measurement contended for by plaintiff from this point to the corporate limits, it would be necessary, either to omit the distance between the center and the nearest public road, or to measure upon a straight line from the center of the county to some point in the nearest public traveled way, and along the traveled way to the county seat. No such dual system of measurement was contemplated; but it was contemplated that a system should be used that would secure the exact distance between the designated points, without omitting any part thereof, for it could easily happen that the distance between the center of the county and the nearest point thereto in any public highway would determine whether the county seat was within or without the six-mile limit. No authorities have been cited by plaintiff in support of its contention upon this proposition. From an examination of the authorities we have been able to make, they appear to be practically in accord that, where distance is to be determined, it must be by a straight line, unless there is something in the nature of the case, or in the context of the act or instrument, indicating an intention to follow a different method. *Burns v. Greaves,* Cooke (Tenn.) 75; *Macon and Smith Counties v. Trousdale County,* 2 Baxt. (Tenn.) 1; *Hagan et al. v. Campbell and Cleveland,* 8 Port. (Ala.) 9, 33 Am. Dec. 267; *Landrum v. Hite's Heirs,* 1 A. K. Marsh. (Ky.) 419; *Jenks et al. v. Morgan,* 6 Gray (Mass.) 448; *Kingsland v. Chittenden et al.,* 61 N. Y. 618; *Bradley v. Wilson,*

58 Me. 357; *Abbey v. McPherson,* 1 Kan. App. 177, 41 Pac. 978; *Wynne v. Alexander,* 29 N. C. 237, 47 Am. Dec. 326; *Burnett v. Thompson,* 51 N. C. 210; *Grant v. Black,* 53 Me. 373; *Best v. Hammond,* 55 Pa. 409. There is a general exception to this rule under statutes providing mileage or payment of fees for distance traveled by officers and witnesses attending upon courts; but the instant case does not fall within the exception.

In *Lake v. Butler,* 5 Ellis & Blackburn, 92, the Court of Queen's Bench construed an act of Parliament which permitted certain actions to be brought "when the plaintiff dwells more than twenty miles from the defendant." The evidence established that the distance in a straight line between the residence of plaintiff and defendant was about twelve miles, but that from the nature of the country it was impracticable to travel this distance in a direct line. By footway, the distance was sixteen miles and six furlongs, and by the nearest traveled carriage road the distance was a little more than twenty miles. Lord Campbell, C. J., in the opinion, said:

"I am of the opinion that the distance is to be measured in a straight line along the horizontal plane from point to point. The words in the act, 'where the plaintiff dwells more than twenty miles from the defendant,' are general, and do not specify how the distance is to be measured. We are therefore to consider what is the meaning of the Legislature, and I think that we must suppose that the Legislature intended by the words to express the meaning that would be most convenient and capable of being ascertained. Now, if the distance is to be measured by the nearest practicable way, see how uncertain it is. The nearest mode of access may be by boat, by route varying every day according to the state of the tide; or, if it be by land, it may be rendered longer or shorter by changes in the road. But if the straight line measurement be adopted, there can be no uncertainty. Even where there are mountains to be ascended and descended, it is easy for a surveyor to ascertain the distance from point to point."

*Macon and Smith Counties v. Trousdale County, supra,* is a well-considered case. A constitutional provision of Tennessee authorized new counties to be established in certain territory, but provided that no line of such new county should approach

nearer than ten miles to the courthouse of the old county; and it was held that the distance from the new line to the courthouse should be ascertained by measurement upon a straight line.

There is nothing in the context of the constitutional provision here involved·to indicate that a different method of measurement should be adopted.than upon a straight line; and, in addition to the impracticability of any other method in most cases, there appears from the context of this provision an additional reason why no other method was within the intent of the framers of the Constitution. The provision requires the measurement to be made from the nearest corporate limits of the county seat as they existed on the 21st day of January, 1907; the date named being prior to the adoption of the Constitution and the establishment of counties in the state. The evident purpose of this provision was to prevent any town, designated by the Constitution as county seat, from securing an undue advantage by extending the limits of the town for no other purpose than to bring it within the six-mile limit of the geographical center, thereby rendering a less vote necessary to retain the county seat. It was the evident purpose of the constitutional convention to not leave it within the power of any town to shorten the distance between its municipal limits and the geographical center after the adoption of the Constitution. If that distance is measured by straight line, it remains unchanged and is unchangeable; but, if such distance is to be measured by the public traveled way, there is no prohibition in the Constitution from opening up new ways between the corporate limits of the city to the geographical center at any time. A town would then have the opportunity, by opening up a new public way, to render the distance from the corporate limits from the geographical center less than it was on the 21st day of January, 1907; and, in fact, could so alter and change the distance as to make it not only different on the date of any county seat election from what it was on the date mentioned in the constitutional provision, but different on the day of the trial of any contest from what it was on the day of the election. No such uncertain, indefinite, and changeable method of ascertaining this distance was intended to be authorized. The

framers of the Constitution would not have foreclosed one opportunity to towns to shorten the distance between their corporate limits and the geographical center as it existed at the time mentioned in the Constitution, and at the same time provided another equally available means to accomplish that very purpose.

It is admitted that the city of Newkirk is, and has been ever since before the 1st day of January, 1901, a city of the first class. An ordinance, adopted and approved by the city council on the 4th day of November, 1901, was introduced, by which section 26, township 28, range 2 east, is annexed to the city of Newkirk, and the corporate limits of the city are extended so as to include said tract of land. This tract of land is by the ordinance divided into two divisions, named, respectively, Farnsworth addition and Academy addition. These additions lie between the original corporate limits of the city and the geographical center of the county, and the measurement of the distance between the nearest corporate limits of the city, as they existed on the 21st day of January, 1907, was made from the corporate limits of these additions. The evidence also establishes that immediately after the passage of the ordinance extending the corporate limits of the city around these additions the city assumed jurisdiction over them. It opened up and graded streets, laid sidewalks and crossings, extended its waterworks system, electric light system, and sewer system through them, has continually taxed the property thereon, which taxes have been paid, has furnished school facilities to the children of the inhabitants on said additions, and these additions now constitute one of the substantial resident portions of the city. No one, until this proceeding, has ever questioned the validity of the ordinance or of the proceeding of the city council, extending the corporate limits so as to include these additions. Plaintiff, however, insists that the competent evidence in this record fails to establish a valid annexation of these additions to the corporate limits of the city, in that the ordinance does not disclose that these additions, when annexed, were subdivided into tracts or parcels of land of less than five acres with more than one residence thereon, or that the written consent of

the owner of the majority of the whole number of acres owned by the residents of these additions was obtained.

Section 458 of Wilson's Rev. and Ann. St. provides that the city council may annex other territory adjacent to the city limits at such times as it shall be desirable, in the opinion of the council, to make such additions:

"Provided, that in no case shall any additional territory, except when subdivided into tracts or parcels of less than five acres, with more than one residence thereon, be added to the city limits without the consent in writing of the owner of a majority of the whole number of acres owned by residents of the territory to be added; * * * provided, that tracts of land in excess of five acres used for agricultural purposes shall not be subject to city taxes."

This statute authorizes cities of the first class to enlarge their corporate area by annexing territory, and is, to that extent, one for the organization of such corporations. *City of Topeka v. Dwyer et al.,* 70 Kan. 244, 78 Pac. 417. Plaintiff seeks by this contention to attack in a collateral proceeding the corporate existence of the city as to these additions. That it cannot do so is well settled by the authorities.

"Where a municipal corporation is acting under color of law, and its existence is not questioned by the state, it cannot be collaterally drawn in question by private parties; and the rule is not different, although the Constitution may prescribe the manner of incorporation." (Article 43a, 1 Dillon's Municipal Corporations [4th Ed.]).

For a period of about nine years, the city of Newkirk has exercised municipal authority over these additions, levying and collecting taxes thereon, and doing all other things incidental to maintaining a municipal government. All these acts, including the ordinance of annexation, have been done under a statute authorizing cities of the first class to annex territory to their corporate limits, and there has been at least an organization under color of law, and a municipal corporation *de facto* exists therein at the present time. In the syllabus by the court, in *Railway Co. v. Lyon County,* 72 Kan. 16, 84 Pac. 1031, it is said:

"Where a city of the second class has attempted by an ordinance to annex certain territory, and in pursuance thereof has exercised municipal authority over the same for eighteen years, levying and collecting taxes thereon, and treating it in all respects as an integral part of the municipal organization, the validity of the ordinance cannot· be attacked in a collateral proceeding by a private party, who seeks to recover taxes levied upon property in such territory upon the ground that it is not a part of the city."

Other cases from the same court sustaining this proposition are *McGrew v. Stewart,* 51 Kan. 185, 32 Pac. 896; *City of Topeka v. Dwyer et al., supra.* The last-mentioned case is a well-considered case, in which are collected so many authorities, both from that state and from the courts of other states, supporting the rule here applied that we deem it unnecessary to cite further authority, or to discuss the reasons upon which the rule is founded.

The certificate of the Secretary of State, by which the geographical center of the county was established, was dated and executed on July 22, 1908. Plaintiff contends that said certificate is invalid, because prematurely issued, and relies upon *City of Blackwell v. Cross,* 22 Okla. 748, 98 Pac. 905, as supporting this contention; but such is not the effect of the decision in that case. In that case, relator (plaintiff here) sought, by an original action in this court, to obtain a writ of mandamus compelling the Secretary of State to ascertain the geographical center of Kay county, and in doing so to leave out of consideration the Chilocco reservation. The suit was instituted after the first election for the selection of the county seat of Kay county, under the provisions of the Constitution, had been held. At the first election, there were three candidates, no one of which received a sufficient vote, under the Constitution, to entitle it to the permanent ·county seat. Before plaintiff filed its petition in that cause, the Secretary of State had ascertained the center of the county, including the Chilocco reservation as a part of the county, and had executed the certificate used in this case. Plaintiff sought by that proceeding to require the Secretary of State to redetermine the geographical center, and to correct the error it alleged the Secretary

of State had made in ascertaining the center in the first instance, by excluding the Chilocco reservation. The court held that the certificate of the Secretary of State as to the geographical center of any county provided for by the Constitution was intended as a guidance to those whose duty it is to determine and declare the result of a county seat election; and that, as the second election had not been held, and it could not be determined in advance that the Secretary of State's certificate would ever be needed by the officers charged with the duty of determining and declaring the result of the election, it could not be said that the Secretary was under such duty to issue it as would authorize the writ of mandamus to compel him to perform that duty at that time. It was not held that the Secretary of State was without authority to determine at that time the geographical center of the county and execute certificate showing same. The Constitution clearly authorizes the Secretary of State to determine the geographical center of a county for the purposes of determining the permanent location of a county seat, and does not fix the time within which he shall exercise such authority. Although the Secretary, on the date he did determine the center of the county and issue the certificate here involved, was under no such duty that, if he had refused to determine its location, or to issue this certificate, he could have then been compelled to do so by either party to this case, he had authority to act; and if he voluntarily did so his certificate is not void.

It is also objected that the distance from the geographical center to the corporate limits of defendant have not been measured by the Secretary of State, and that such distance was established by the evidence of others, who measured such distance. The Constitution requires the geographical center to be determined by certificate from the Secretary of State, but it does not provide by whom the measurement from the center to the corporate limits shall be made. It does not provide that the distance from the center to the corporate limits shall be determined by the certificate of the Secretary of State; and, since there was specific direction as to by whom the center of the county should be determined, it is reasonable to presume that it was intended

that the distance from the center to the nearest corporate limits, when required to be determined, should be determined by measurement by any one competent to measure same; and, if measurements are made by different people that do not correspond, the correct measurement is a question of fact for the court to determine.

From the foregoing conclusions, it follows that plaintiff's motion to set aside the referee's report and grant a new trial should be overruled; and that defendant's motion to confirm the report should be sustained, and judgment should be entered, declaring Newkirk to have been selected as the county seat of Kay county; and it is so ordered.

TURNER, C. J., and DUNN and WILLIAMS, JJ., concur; KANE, J., absent, and not participating.